UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: The Honorable Jennifer Choe-Groves, Judge

| | |
|---|---|
| KUMAR INDUSTRIES AND BAJAJ HEALTHCARE LIMITED<br><br>          Plaintiff,<br>v.<br><br>THE UNITED STATES,<br><br>          Defendant, | Court No. 25-00081 |

PUBLIC VERSION

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF
PLAINTIFF'S 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Lizbeth R. Levinson
Brittney R. Powell

FOX ROTHSCHILD LLP
2020 K Street, N.W.
Suite 500
Washington, DC  20006
Tel: (202) 794-1182
Email: llevinson@foxrothschild.com

*Counsel for Plaintiff's Kumar Industries
and Bajaj Healthcare Limited*

October 20, 2025

## TABLE OF CONTENTS

TABLE OF CONTENTS                                                                    i

TABLE OF AUTHORITIES                                                          ii-iv

I.      STATEMENTS PURSUANT TO RULE 56.2(c)(2)                          1

      A.    The Administrative Determination Sought to Be Reviewed        1

      B.    Statement of the Issues                                       2

      C.    Standard of Review                                            3

II.     STATEMENT OF FACTS                                                 4

III.    SUMMARY OF THE ARGUMENT                                            10

IV.    ARGUMENT                                                          11

      A.    Commerce's Decision to Assign Kumar a Rate Based on Total Facts
            Available is Not Supported by Substantial Evidence on the Record   11

            1.  The Legal Standard for Application of Total Adverse Facts Available   11

            2.  The Affiliation Between Kumar and Companies A and B   15

            3.  The Affiliation Between Kumar and Companies C and D   18

      B.    Commerce's Determination to Assign a Rate of 28.59% to the Separate
             Rates Companies Is Not Supported by Substantial Evidence or Otherwise
             in Accordance with Law                                        21

V.     CONCLUSION                                                        23

# TABLE OF AUTHORITIES

## FEDERAL STATUTES

19 U.S.C. § 1516a(b)(1)(B) ............................................................................ 3

19 U.S.C. § 1673d ........................................................................................... 22

19 U.S.C. § 1673d(c)(5) .................................................................................. 21

19 U.S.C. § 1673d(c)(5)(A) ............................................................................ 21

19 U.S.C. § 1677e(a)-(b) ................................................................. 11, 14, 15, 21

19 U.S.C. § 1677e(a)(2) ................................................................................... 11

19 U.S.C. § 1677e(b) ...................................................................................... 11

19 U.S.C. § 1677m(d) ......................................................................... 14, 15, 21

19 U.S.C. § 3512(d) ........................................................................................ 22

## FEDERAL CASES

*Albermarle Corp. v. United States,*
    821 F.3d 1345, 1351 (Fed. Cir. 2016) ...................................................... 22

*Atl. Sugar, Ltd. v. United States*,
    744 F.2d 1556, 1562 (Fed. Cir. 1984) ......................................................... 3

*Altax Inc. v. United States,*
    370 F.3d 1108, 1116 (Fed. Cir. 2004) ...................................................... 11

*American Honey Producers Association v. United States,*
    653 F. Supp. 3d 1329, 1335 (Ct. Int'l Trade 2023) .................................... 38

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. 156, 158 (1962) .............................................................................. 3

*Chaparral Steel v. United States,*
    901 F. 2d 1097 (Fed. Cir. 1990) ................................................................ 11

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197, 229 (1951) .............................................................................. 3

*CS Wind Vietnam Co. v. United States,*
    832 F.3d 1367, 1373 (Fed. Cir. 2016) ...................................................... 11

*Diamond Sawblades Mfrs. Coal., v. United States,*
    42 CIT ___, ___, Slip Op. 18-146 at 2 (October 23, 2018) ....................... 12

*E.I. DuPont de Nemours & Co. v. United States,*
    22 C.I.T. 19, 32 (Ct. Int'l Trade 1998 ....................................................... 13

*Essar Steel Ltd. v. United States,*
    678 F.3d 1268, 1276 (Fed. Cir. 2012) ...................................................... 12

*F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States,*
    216 F.3d 1027, 1032 (Fed. Cir. 2000) ...................................................... 12

*Fujitsu General. Ltd. v. United States*,
    88 F.3d 1034, 1038 (Fed. Cir. 1996) ........................................................... 2

## FEDERAL CASES CONT'D

*Gerber Food (Yunnan) Co. v. United States,*
    387 F. Supp. 2d 1270, 1280 (Ct. Int'l Trade 2005)         11, 15

*Guizhou Tyre Co. v. United States,*
    389 F.Supp. 3d 1315, (Ct. Int'l Trade 2019)         13

*Maverick Tube Corp.. v. United States,*
    857 F.3d 1353, 1359 (Fed. Cir. 2017)         11

*Meihua Group International Trading (Hong Kond), Ltd. v. United States,*
    686 F. Supp. 3d 1359, 1370 (Ct. Int'l Trade 2024)         15, 21

*Metallverken Nederland B.V. v. United States,*
    728 F. Supp. 730, 734 (Ct. Int'l Trade 1989)         3

*Nucor Corp. v. United States,*
    594 F. Supp. 3d 1320, 1331-32 (Ct. Int'l Trade 2008)         3

*PAM, S.p.A. v. United States,*
    582 F.3d 1336, 1339 (Fed. Cir. 2009)         3

*Rhone Poulenc, Inc. v. United States,*
    899 F.2d 1185, 1191 (Fed. Cir. 1990)         12

*Risen Energy Co., Ltd. v. United States,*
    477 F. Supp. 3d 1332 (Ct. Int'l Trade 2020)         11

*Timken Co. v. United States,*
    240 F. Supp. 2d 1228, 1234 (Ct. Int'l Trade 2002)         12

*U.S. Steel Corp. v. United States,*
    637 F. Supp. 2d 1199, 1204 (Ct. Int'l Trade 2009)         12

*Yangzhou Bestpak Gifts & Crafts Co. v. United States,*
    716 F.3d 1370, 1374 (Fed. Cir. May 20, 2013)         21, 22

*Zhejiang DunAn Hetian Metal Co. v. United States,*
    652 F.3d 1333, 1341 (Fed. Cir. 2011)         3

## ADMINISTRATIVE DECISIONS

*Glycine from India:*
    90 Fed. Reg. 15,689 (April 15, 2025)         2, 4, 12

*Glycine from India:*
    89 Fed. Reg. 55,565 (July 5, 2024)         7

*Glycine from India:*
    88 Fed. Reg. 77752 (Nov. 13, 2023)         23

*Stainless Steel Flanges from India:*
    88 Fed. Reg. 14,125 (March 7, 2023)         13

## OTHER SOURCES

*Statement of Administrative Action accompanying the Uruguay Round Agreements Act*,
 H.R. Doc. No. 103-316, Vol. 1 at page 873 (1994)                    22

## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: The Honorable Jennifer Choe-Groves, Judge**

| | |
|---|---|
| KUMAR INDUSTRIES AND BAJAJ HEALTHCARE LIMITED<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>THE UNITED STATES,<br><br>　　　　　　Defendant. | Court No. 25-00081<br><br>**PUBLIC　VERSION** |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

On behalf of Plaintiffs' Kumar Industries ("Kumar") and Bajaj Healthcare Limited ("Bajaj") (collectively, "Plaintiffs"), foreign producers and/or exporters of glycine manufactured in India, we respectfully submit the following memorandum of points and authorities in support of Plaintiffs' 56.2 motion for judgment on the agency record in this action. For the reasons stated below, the U.S. Department of Commerce's ("Commerce") decision to replace all of Kumar's data with facts available and then apply adverse inferences to those facts is unsupported by substantial evidence on the record.

## I.　　STATEMENTS PURSUANT TO RULE 56.2(c)(2)

### A. The Administrative Determination Sought to Be Reviewed

Plaintiffs hereby contest the final results of the antidumping duty administrative review of glycine from India issued by the International Trade Administration of the U.S. Department of Commerce, and published in the Federal Register on April 15, 2025. *See Glycine from India:*

1

PUBLIC VERSION

*Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 15,689 (April 15, 2025) ("Final Results") (P.R. 204).[1]  The administrative review covered the period from June 1, 2022 through May 31, 2023 ("POR").  The findings and conclusions of the contested determination were set forth in an accompanying Issues and Decision Memorandum ("Final IDM") dated April 8, 2025 (P.R. 202) and an Adverse Facts Available Memorandum dated April 23, 2025 ("AFA Memo.") (C.R. 172).  In the Final Results, Commerce applied total adverse facts available ("AFA") to mandatory respondent Kumar and assigned Kumar an antidumping duty rate of 57.17 percent.

Bajaj participated in the administrative review as a non-selected respondent.  In the Final Results, Commerce assigned Bajaj a separate rate of 28.59 percent in this administrative review, which was based upon the simple average of the AFA rate assigned to Kumar of 57.17 percent and the zero percent dumping margin calculated for the other mandatory respondent in this proceeding, Avid Organics Private Limited ("Avid") (P.R. 204).

## B.  Statement of the Issues

1.   Whether Commerce's determination to assign Kumar a rate based on total AFA on the grounds that Kumar allegedly withheld information that prevented Commerce from determining whether Kumar was affiliated with Company A, Company B, Company C, and Company D, was unsupported by substantial evidence on the record and otherwise contrary to law.

---

[1] Citations to the confidential and public records are denoted by the abbreviations "C.R." and "P.R.," respectively.

178304341.1

PUBLIC VERSION

2.   Whether Commerce's determination to calculate a separate rate for Bajaj based upon the simple average of Kumar's AFA rate and Avid's zero rate, resulting in a dumping margin of 28.59 percent, is contrary to law.

## C.  Standard of Review

When reviewing an antidumping duty determination, the Court must sustain Commerce's results unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B); *see also Fujitsu General Ltd. v. United States,* 88 F.3d 1034, 1038 (Fed. Cir. 1996).  Substantial evidence is "more than a mere scintilla," and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009), *quoting Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1951).  In order for a determination to satisfy this standard, "{t}here must be a rational connection between the facts found and the choice made."  *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 158 (1962); *Nucor Corp. v. United States*, 594 F. Supp. 3d 1320, 1331-32 (Ct. Int'l Trade 2008).

The Court is not to reweigh the evidence or substitute its judgment for that of Commerce. *See Metallverken Nederland B.V. v. United States*, 728 F. Supp. 730, 734 (Ct. Int'l Trade 1989). Rather, the Court must determine "whether a reasonable mind could conclude that Commerce chose the best available information."  *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011).  Judicial review of agency action must be based on the record as a whole, and the Court must take into account "whatever in the record fairly detracts from its weight."  *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

178304341.1

PUBLIC VERSION

## II.    <u>STATEMENT OF FACTS</u>

The issue in this appeal concerns Commerce's application of total adverse facts available to Kumar based on its alleged withholding of information that prevented Commerce from determining whether Kumar was affiliated with Company A[2], Company B[3], Company C[4], or Company D.[5]

The administrative review subject to this appeal is the fourth administrative review of the antidumping duty order on *Glycine from India.*  Kumar Industries has participated as a mandatory respondent in prior administrative review segments and submitted extensive information about the nature of its affiliations with Companies A, B, C and D.   In this administrative review, Kumar complied with Commerce's requests to resubmit certain responses from the previous review segments.  *See* First Supplemental Section A Response dated April 1, 2024 (C.R. 73).

In the initial Section A Response, Kumar submitted a list of affiliates or group companies, which included the names of Companies A, B, C, and D.  *See* Initial Section A Response at Exhibit A-3 (C.R. 10).  Kumar also reported the names of its partners and their respective shares in Companies A and B as of May 31, 2023.  *See* Initial Section A Response at Exhibit A-3(a) (C.R. 10).  Kumar explained that effective April 1, 2023 (in the 11th month of the current POR), partners of Kumar became partners in Companies A and B.  *See id.* at 6 and Exhibit A-5(h) (C.R. 8 and 10).  Kumar's partners were previously partners in Companies A and B until [                    ], respectively, when they retired from those companies.  *See* First

---

[2] In the Final IDM, Commerce refers to [                         ] as Company A.
[3] Company B refers to [                         ].
[4] Company C refers to [                         ].
[5] Company D refers to [                         ].

178304341.1

PUBLIC VERSION

Supplemental Section A Response at Exhibits A-20 (Retirement Deed from Company A) and A-19 (Retirement Deed from Company B) (C.R. 77).  Commerce has cast doubt upon Kumar's position in previous review segments that it was no longer affiliated with Companies A and B after Kumar's partners retired from those companies in [                    ], despite the supporting documentation to substantiate these claims.

Notwithstanding Kumar's affiliation status with Companies A and B, Kumar did not make any sales of glycine or purchase glycine or any inputs used in the production of glycine from Companies A and B, or any other affiliate, during the POR.  *See* Initial Section A Response (C.R. 8); *see also*   Kumar submitted the sales registers for both Companies A and B during the POR in the First Supplemental Section A Response.  *See* Exhibits A-37 (Company A's Sales Register) and A-36 (Company B's Sales Register) (C.R. 126).  Company A's sales register shows that it did not make any sales to Kumar during the POR.  *See* Exhibit A-37 (C.R. 126). Company B's sales register shows that while it did make sales of some products to Kumar during the POR, all of the merchandise sold pertained to non-merchandise under consideration, and did not involve inputs required to produce glycine.  *See* Exhibit A-36 (C.R. 126) and *compare* with Initial Section D Response at Exhibit D-3 (List of Raw Materials to Produce Glycine) (C.R. 29). In the Supplemental B, C, and D Response submitted on June 4, 2024, Kumar provided a clear breakdown of the products (chemical type) and value that it purchased from Company B during the POR.  *See* Supplemental B-D Response at 8 (C.R. 135).  There is no overlap between the types of chemicals Kumar purchased from Company B during the POR and the chemicals that are used in the production of glycine.

Kumar also fully explained the affiliation status with Companies C and D in its questionnaire responses. Prior to the initial investigation of this AD order, partners of Kumar had

178304341.1

PUBLIC VERSION

once been the owners of Companies C and D, but sold their interest in these companies and no longer retained any interest or control over their former business operations.  In the initial Section A Response, Kumar reported Companies C and D among the list of companies in which members of the [                    ] have ownership interests in Exhibit A-3.  *See* Initial Section A Response, October 5, 2023 at 7 (C.R. 8); *see also* Exhibit A-3 (C.R. 10).  Although Kumar disclosed Companies C and D along with its list of affiliates, the company clarified in the response that the partners of Kumar submitted their resignation letters to both Company C and Company D in [        ].  *See* First Supplemental Section A Response, dated April 1, 2024 at Exhibit A-28 (Kumar's September 16, 2021 Section A Response for the 2nd Administrative Review) (C.R. 85-86). However, due to an unresolved financial dispute between the [                                    ] and another family with interests in these companies, the [                    ], those companies have been unable to complete the process of removing or striking the names of the [                        ] members from the official registry of Companies C and D.  *See* Exhibit A-3 (C.R. 10).  The Indian Companies Act of 2013 prevents companies from making such changes to their records during the pendency of a dispute; therefore, the status of the [                        ] interest in Company C and Company D are still reflected as active in the records of the Ministry of Corporate Affairs.  *See* Section A Response at 8 (C.R. 8).  Kumar also reported that it did not sell any glycine to Companies C and D, or to any other affiliate, in the home market during the POR.  *Id.*

In the First Supplemental Section A Response, Kumar provided further details and information regarding the affiliation status of Companies C and D.  *See* First Supplemental Section A Response (C.R. 73).  In that questionnaire, Commerce requested that Kumar provide the audited financial statements for Company C and Company D for the fiscal years ending

178304341.1

PUBLIC VERSION

March 31, 2022 and March 31, 2023. Kumar explained in its response that it was unable to provide the financial statements to Commerce because it had no access to or control over Companies C and D, and therefore did not have access to those companies' account information or financial statements for the requested periods. *See* First Supplemental A Response at 20 (C.R. 73). Consistent with its position in the initial Section A response and in previous administrative reviews, Kumar reiterated that the partners of Kumar submitted their resignation letters from Companies C and D in the year [       ]. Furthermore, Company D [

                              ] and informed the Central Excise Department of India of its [

                    ]. *See id.* at 19-20 (C.R. 73). Kumar also explained that there were no transactions between itself and Company C, whether related to glycine or any other merchandise during the POR. *See* First Supplemental A Response at 21 (C.R. 73).

In the Preliminary Results, Commerce calculated a zero-dumping margin for Kumar using the company's sales and cost information from its books and records. The Preliminary Results were published in the Federal Register on July 5, 2024. *See Glycine from India: Preliminary Results and Rescission, In Part, of Antidumping Duty Administrative Review; 2022-2023*, 89 Fed. Reg. 55,565 (July 5, 2024) ("Preliminary Results") (P.R. 174). The preliminary issues and decision memorandum was issued on June 28, 2024, wherein Commerce preliminarily determined that Kumar was affiliated with Companies A and B ("Prelim. IDM") (P.R. 169 at 4). Commerce explained that it would evaluate the response to a supplemental questionnaire outstanding at the time of the Preliminary Results to determine whether to collapse Kumar and the affiliated companies for the Final Results. *Id.* Notably, Commerce did not find that AFA was warranted in the Preliminary Results based upon any alleged failure by Kumar to cooperate to the best of its ability to report the status of its affiliations with Companies A, B, C, or D.

<div align="center">7</div>

PUBLIC VERSION

After the issuance of the Preliminary Results, Kumar submitted its response to the third supplemental questionnaire which solely addressed the issue of whether Company B sold materials to one of Kumar's input suppliers for glycine production, [                    ].  *See* Third Supplemental Response, June 27, 2024 (C.R. 149).  Kumar reiterated that during the POR, [                    ] did not purchase any inputs used in glycine production (or any other materials) from Company B, as shown in Company B's sales register submitted in Exhibit A-36. This fact was further substantiated by Company B's financial statements for the fiscal year ending March 31, 2023, which did not identify [               ] as having a balance in the [                    ] for the 2022-2023 fiscal year (this generally refers to companies that owe money to a business for goods or services purchased on credit).  *Id.* Commerce issued this supplemental questionnaire based on an apparent misunderstanding or misreading of Company B's financial statements, which indicated that [                ] was listed under the [          ] account with an accounts receivable balance as of the end of Company B's 2021-2022 fiscal year.  Kumar resolved Commerce's misunderstanding by pointing out there was no [                    ] pertaining to [               ] in Company B's 2022-2023 fiscal year financial statements, which covers the current POR.  *See* Third Supplemental Response, June 27, 2024 (C.R. 149).

On August 13, 2023, Kumar submitted a rebuttal brief in response to arguments in Petitioner's case brief. (C.R. 169).  Kumar argued that it cooperated to the best of its ability and provided all available information requested by Commerce with respect to the nature of its affiliations, including the details of sales made by Companies A and B, the circumstances surrounding the Kumar partners' acquired interest in Companies A and B on April 1, 2023, among other information.  *Id.*

PUBLIC VERSION

Commerce issued the Final Results on April 8, 2025, which were published in the Federal Register on April 15, 2025. *See* Final Results (P.R. 204) and Final IDM (P.R. 202). Commerce applied total AFA to Kumar in the Final Results on the basis that necessary information is not available on the record, and Kumar withheld requested information by established deadlines and thereby significantly impeded the administrative review. *See* Final IDM at 6 (P.R. 202). As a result, Commerce assigned Kumar the AFA rate of 57.17 percent. Commerce also assigned a separate rate of 28.59 percent to Bajaj Healthcare, based upon a simple average of the 57.17 AFA rate assigned to Kumar and the zero rate calculated for the other mandatory respondent Avid Organics Private Limited. *See* Final Results (P.R. 204).

Despite finding in the Preliminary Results that Kumar was affiliated with Companies A and B, and calculating a company-specific antidumping margin of zero for Kumar, Commerce determined in the Final Results that Kumar failed to report its affiliations with Companies A and B prior to April 1, 2023. *See* AFA Memorandum ("AFA Memo.") (C.R. 172). Commerce's justification for applying AFA with respect to Companies A and B was based on a finding that Kumar allegedly withheld information regarding Companies A and B's affiliations during the last two months of the POR and the first ten months of the POR. *Id.* at 3. Although Commerce clearly views with suspicion Kumar's explanations regarding the nature of the affiliations with Companies A and B, the agency failed to articulate the specific information that Kumar withheld in this administrative review sufficient to warrant the application of AFA.

Commerce also found in the Final Results that Kumar withheld information regarding its affiliations with Companies C and D. Commerce continues to discount Kumar's explanation that the Indian Companies Act of 2013 prevents certain changes to registries for these entities while they are engaged in ongoing financial disputes. Commerce also penalized Kumar for its inability

9

PUBLIC VERSION

to submit financial statements for Companies C and D, despite Kumar's express lack of access to and control of that information.

Despite calculating a company-specific margin for Kumar in the Preliminary Results, Commerce determined in the Final Results that Kumar's purported failure to cooperate to the best of its ability to comply with information requests about the affiliations undermined the validity of the company's submissions overall.  *See* Final IDM at 10 (P.R. 202).

## III.    <u>SUMMARY OF THE ARGUMENT</u>

For the reasons set forth below, the record evidence does not support Commerce's application of total adverse facts available.  Kumar cooperated in all facets of the review, and responded in full to the initial and supplemental questionnaires.  Commerce's conclusion that Kumar failed to cooperate by withholding information regarding the nature of its affiliations, and thereby impeded the agency's ability to calculate an accurate dumping margin is not supported by substantial evidence on the record.  In fact, Kumar accurately provided extensive information regarding its affiliation status with Companies A-D on every occasion requested by Commerce.  Ultimately, however, the status of Kumar's affiliations with these companies has no bearing on its dumping margin based on the facts of this record.  As discussed herein, none of these companies were involved in the sale, production, or distribution of the merchandise under consideration (e.g., glycine).  Accordingly, there is no nexus between a determination of whether Kumar is affiliated with Companies A-D, and an accurate calculation of Kumar's dumping margin.  Commerce was able to calculate an accurate dumping margin for Kumar in the Preliminary Results based on its sales and cost information, and it should have continued to do so in the Final Results.

In addition, Commerce's determination of a separate rate margin in the amount of 28.59 is not supported by substantial evidence on the record and was not otherwise in accordance with law.

### IV.    ARGUMENT

**A.    Commerce's Decision to Assign Kumar a Rate Based on Total Facts Available is Not Supported by Substantial Evidence on the Record.**

#### 1.    The Legal Standard for Application of Total Adverse Facts Available

The application of AFA encompasses a two-part inquiry established by statute. *See* 19 U.S.C. § 1677e(a)-(b). The statute first requires Commerce to identify necessary information missing from the record or to determine that a party has: (1) withheld requested information; (2) failed to provide information by established deadlines or in the form or manner requested; (3) significantly impeded the review; or (4) provided information that cannot be verified. 19 U.S.C. § 1677e(a)(2); *see also Gerber Food (Yunnan) Co., Ltd. v. United States*, 387 F. Supp. 2d 1270, 1280 (Ct. Int'l Trade 2005). Commerce must then make a second and separate finding that a party failed to cooperate to the best of its ability to justify the use of an adverse inference when "selecting among the facts otherwise available." 19 U.S.C. § 1677e(b); *see Risen Energy Co, Ltd. v. United States*, 477 F. Supp. 3d 1332 (Ct. Int'l Trade 2020).

Further, the application of AFA must be supported by substantial evidence on the record. Substantial evidence is "more than a mere scintilla," but "less than the weight of evidence." *Altax, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004). "A finding is supported by substantial evidence if a reasonable mind might accept the evidence as sufficient to support the finding." *Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1359 (Fed. Cir. 2017) (citation omitted). "The substantiality of evidence must take into account whatever in the record fairly

178304341.1

PUBLIC VERSION

detracts from its weight." *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016)

In addition, it is axiomatic that the antidumping law is not meant to be wielded as a punitive tool, which is exactly what Commerce has done here. *See Chaparral Steel v. United States*, 901 F.2d 1097 (Fed. Cir. 1990); *Timken Co. v. United States*, 240 F. Supp. 2d 1228, 1234 (Ct. Int'l Trade 2002) ("Commerce should adhere to the overriding goal of the antidumping law, which is not to create a punitive result…"); *U.S. Steel Corp. v. United States*, 637 F. Supp. 2d 1199, 1204 (Ct. Int'l Trade 2009) ("[t]he antidumping laws are not punitive in nature…"). Commerce's discretion to apply AFA is not unbounded, and the application of AFA is not intended to be overly punitive. The agency must be mindful of the overall purpose of the statute, which is to calculate accurate dumping margins. *See Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990). The statute is intended to provide respondents with an "incentive to cooperate with Commerce's investigation, not to impose punitive damages." *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012); *Diamond Sawblades Mfrs. Coal., v. United States,* 42 CIT ___, ___, Slip Op. 18-146 at 2 (October 23, 2018). Commerce has a continuing obligation to balance the statutory objective of finding an accurate dumping margin with the goal of inducing compliance. *See F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States,* 216 F.3d 1027, 1032 (Fed. Cir. 2000).

There is no question that Commerce has wielded AFA as a highly punitive tool in this review, and in the prior three administrative reviews. Kumar has cooperated extensively and does not require any incentive to induce compliance, as evidenced by the fact that it has participated actively and fully in the past four reviews of *Glycine from India*. The facts of this case are complex and unfortunately appear to have distracted Commerce from its main purpose

178304341.1

PUBLIC VERSION

of determining whether Kumar Industries engaged in selling glycine at less than fair value during POR.[6]  Rather than focusing on the antidumping analysis at hand, Commerce has regurgitated the history of the factual past three administrative reviews, all of which culminated in the application of adverse facts available. Commerce's recitation of facts from administrative proceedings from as far back as 2012[7] has no pertinence[8] except to demonstrate a clear bias against Kumar Industries. Commerce simply does not trust this company and perhaps never will regardless of how much supporting documentation the company submits and how much cooperation the company displays.

Stated simply, Kumar cannot get a fair assessment of whether it has engaged in dumping, even in this review, where Commerce calculated a preliminary weighted-average dumping margin of zero for Kumar.  *See* Preliminary Results (P.R. 174).  It is, in fact, difficult to reconcile Commerce's Preliminary Results of zero with its Final Results of AFA, especially where there was no verification or other significant fact-finding between the two diametrically opposed results.

As discussed below, there is no necessary information missing that would justify the application of AFA to fill gaps in the administrative record.  *See e.g. Guizhou Tyre Co. v. United States*, 389 F. Supp. 3d 1315 (Ct. Int'l Trade 2019) (before Commerce can apply adverse facts

---

[6] The period of review is June 1, 2022 to May 31, 2023.
[7] *See* AFA Memo. at 5 (C.R. 172).
[8] *See Stainless Steel Flanges from India: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-2021*, 88 Fed. Reg. 14125 (March 7, 2023) (*citing E.I. DuPont de Nemours & Co. v. United States*, 22 C.I.T. 19, 32 (Ct. Int'l Trade 1998) ("Commerce's longstanding practice, upheld by this court, is to treat each segment of an antidumping proceeding, including the antidumping investigation and the administrative reviews that may follow, as independent proceedings with separate records and which lead to independent determinations.")).

178304341.1

PUBLIC VERSION

available it must determine that any gap in the administrative record "was caused by a respondent's failure to cooperate.").  Although Commerce provided lip service to the statute by observing that "Kumar withheld information requested by Commerce" and that "necessary information is not on the record within the meaning of Section 776(a)(1) of the Act," the agency does not identify a single necessary document that Kumar failed to provide in response to a request from Commerce. Contrary to Commerce's finding, Kumar was a fully cooperative respondent by any reasonable measure and responded to each of Commerce's questionnaires to the best of its ability.  The application of AFA under the circumstances therefore did not serve to induce cooperation as Kumar has repeatedly shown its commitment to full participation and even full verification when requested. In fact, Kumar also participated thoroughly in the past three administrative reviews, submitting voluminous cost and sales data, only to learn the hard way that "no good deed goes unpunished."  In four administrative reviews now, Kumar has received nothing but punishment despite its ardent effort to cooperate and eliminate all dumping from its U.S. sales (demonstrated by the zero percent dumping margin that was assigned to it in the Preliminary Results in this POR).  The determination to assign Kumar a rate based on total adverse facts available in the Final Results of this review contravenes the spirit of the antidumping law, and should be overturned on appeal.

The AFA determination results solely from documentation submitted during the review concerning whether Kumar is affiliated with Companies A-D.  Commerce and petitioners do not claim that Kumar did not cooperate, but rather that certain discrepancies in the record concerning events that occurred as far back as 2012 impugn the record such that a weighted-average antidumping margin cannot be calculated for Kumar.  The record, as discussed below, does not support such a conclusion.  Kumar responded fully and in detail to all inquiries related to affiliation and other issues and never learned that Commerce considered such information

14

PUBLIC VERSION

deficient until issuance of the Final Results.  Under similar circumstances, this Court has held the Commerce failed to fulfill its statutory obligations under 19 U.S.C. § 1677e(a) and 19 U.S.C. § 1677m(d); *see e.g.*, *Meihua Group International Trading (Hong Kong), Ltd. v. United States*, 686 F. Supp. 3d 1359, 1370 (Ct. Int'l Trade 2024) ("[b]ecause Commerce failed to notify Meihua of any deficiencies in its reported supplemental information and failed to give Meihua an opportunity to remedy or explain the deficiencies before determining that the use of facts otherwise available or adverse inferences was warranted, Commerce did not fulfill its statutory obligations under 19 U.S.C. § 1677e(a) and 19 U.S.C. § 1677m(d)").

The fact that Commerce was able to calculate a zero percent margin in the preliminary results of this review demonstrates that verifiable, company-specific information existed on the record that would have permitted Commerce to calculate the Final Results.  Such company-specific evidence was not impugned because of discrepancies in the record related to affiliation. *See Gerber Food (Yunnan) Co., Ltd*. v. *United States,* 87 F. Supp, 2d 1270 (Ct. Int'l Trade 2005) (evidence that producer and exporter misrepresented their export agency agreement did not impugn the veracity of company-specific information that could have been used to determine antidumping rates).  In fact, a key argument discussed below is that the antidumping duty margin would have been the same (zero) regardless of whether Commerce considered Kumar affiliated with Companies A-D or not.  The affiliation issue is simply immaterial to the central issue of whether Kumar sold its merchandise during the POR at less than fair value.

## 2.  The Affiliation Between Kumar and Companies A and B.

Commerce contends that "Kumar withheld information regarding [          ] and [            ] affiliation during both the last two months of the POR and first ten months of the POR. *See* AFA Memo. at 3 (C.R. 172).  Commerce does not cite a single example of a document

PUBLIC VERSION

that was requested by the agency but withheld by Kumar. Even a cursory review shows that the administrative record is replete with compelling and exhaustive evidence regarding affiliation and that Kumar cooperated fully in responding to all questions from Commerce.  The ultimate irony, however, is that the antidumping margin would be the same regardless of whether Companies A and B were found to be affiliated, or non-affiliated, as discussed below. Commerce elevated the issue of affiliation as if it is instrumental to the Final Results, when in fact it is completely irrelevant because neither Company A nor B were involved in the sale, distribution, production and development of subject merchandise.

Kumar reported in response to Section A of the initial questionnaire that it was affiliated with Companies A and B as of April 1, 2023 (*i.e.* during two months of the POR).  *See* Section A Response at 5-6 (C.R. 8).  Specifically, Kumar reported that [

].  *See* Kumar's Section A Response at Exhibits  A-3, A-3(a), and A-4 (C.R. 10).  Kumar also reported that [

].  *Id*.  In recognizing the relationships among the three companies, Kumar stated in its Section A narrative response that "[t]his is a change from the prior PORs where Kumar was not affiliated and did not control such entities."  Kumar's Section A Response at 6 (C.R. 8).

Based on these facts, Commerce acknowledged in its preliminary analysis memorandum that:

<div align="center">16</div>

PUBLIC VERSION

Kumar reported that it shared common managing partners, shareholders and managing directors with the following companies which had ongoing operations during the POR:

1. [                           ] (hereafter referred to as "Company A")
2. [                              ] (hereafter referred to as "Company B")

Because of the significant degree of common ownership and the significant degree of shared managing partners/directors between Kumar and each of these companies, and because Kumar and each of these companies are owned entirely by [                           ], we find that Kumar is affiliated with each of these two companies within the meaning of section 771(33)(F) of the Act.

*See* Preliminary Analysis Memorandum for Kumar Industries at 3 (C.R. 151).

The same evidence cited above should have been sufficient to support a finding that Company A and Company B were affiliated for purposes of the Final Results. Yet, inexplicably, Commerce found it necessary to re-visit evidence from three prior reviews in order to examine whether Kumar and Companies A and B were affiliated during the first ten months of the POR (as Commerce believed from evidence adduced in prior administrative reviews, but Kumar denied), or merely during the last two months of the POR (as Kumar maintained).

It is clear that Commerce views the evidence of non-affiliation from prior reviews with great suspicion. Kumar is at a loss to understand, however, why Commerce has concentrated so intensely on discrediting evidence submitted by Kumar in prior reviews demonstrating non-affiliation, rather than simply finding that the companies were affiliated in this review based on evidence on the record. Kumar has acknowledged that it was affiliated with Companies A and B in this review at least for two months during this POR, and did not object to Commerce's decision to treat Kumar and Companies A and B as affiliated in the Preliminary Results. Commerce should have reached the same conclusion in the Final Results.

17

PUBLIC VERSION

The striking irony, however, is that the issue of affiliation between Kumar and Companies A and B is ultimately "much ado about nothing."  Throughout this administrative review, Kumar has provided sales data as if the companies are all affiliated.  In the First Supplemental Section A Response, Kumar submitted the complete sales registers for Company A and Company B, covering the POR.  *See* 1st Supplemental Section A Response at Exhibits A-36 and A-37; (C.R. 126). The sales registers show the names of the customers and the descriptions and values of the products sold, confirming that neither Company A nor Company B had any sales of glycine to any company during the POR. *Id.*  Further, Company A did not make any sales of any products to Kumar during the POR.  *Id.*  Although Company B did make sales of some products to Kumar during the POR, the materials sold did not involve glycine or inputs used in the production of glycine.  *Compare* Exhibit A-37 (C.R. 126) *with* Exhibit D-3 of the Initial Section D Response (C.R. 29).   The exhaustive record evidence shows that neither Company A nor Company B were involved in the sale, distribution, production and development of glycine.  Their data, therefore, would have no bearing on the antidumping margin calculated for sales of glycine.

In sum, the issue of whether Kumar is affiliated with Companies A and B is nothing more than a red herring because the antidumping margin would be the same regardless of whether the companies were viewed as affiliates or non-affiliates.

### 3.  The Affiliation Between Kumar and Companies C and D

Commerce also claims that "Kumar withheld information regarding [                        ], (Company C) and [                                    ] (Company D's) affiliation," thereby further justifying the total adverse facts available.  *See* AFA Memo at 4 (C.R. 172).  Yet, once again, the facts show that the calculation of the antidumping duty has no

nexus to whether Kumar is affiliated with Companies C and D.    The record does not contain any evidence that either Company C or Company D were involved in any capacity with selling or producing glycine.

Once again, the record does not demonstrate that Kumar withheld any documentation. Nor does it show that Kumar's response impeded the investigation or amounts to a failure to cooperate.  Kumar fully explained the affiliation status with Companies C and D in its questionnaire responses.  Kumar provided a list of affiliates in the initial Section A Response, and explained that members of the [                ] have ownership interests in the affiliated companies that were listed in Exhibit A-3.  *See* Initial Section A Response, October 5, 2023 at 7 (C.R. 8).  Companies C and D were among those companies listed in Exhibit A-3.  *See* Exhibit A-3 (C.R. 10).  Although Kumar disclosed Companies C and D among its list of affiliates, the company clarified in the same response and exhibit that the partners of Kumar submitted their resignation letters to both Company C and Company D in [        ].  *See* Exhibit A-3 (C.R. 10); *see also* First Supplemental Section A Response, dated April 1, 2024 at Exhibit A-28 (Kumar's September 16, 2021 Section A Response for the 2nd Administrative Review) (C.R. 85-86). However, due to an unresolved financial dispute between the [                ] and another family with interests in these companies, the [                ], those companies have been unable to complete the process of removing or striking the names of the [                ] members from the official registry of Companies C and D.  *See* Exhibit A-3 (C.R. 10).  The Indian Companies Act of 2013 prevents companies from making such changes to their records during the pendency of a dispute; therefore, the status of the [                ] interest in Company C and Company D are still reflected as active in the records of the Ministry of Corporate Affairs.  *See* Section A Response at 8 (C.R. 8).  Kumar also reported that it did not sell

19

PUBLIC VERSION

any glycine to Companies C and D, or to any other affiliate, in the home market during the POR. *Id.*

In the First Supplemental Section A questionnaire, Commerce requested that Kumar provide the audited financial statements for Company C and Company D for the fiscal years ending March 31, 2022 and March 31, 2023. Kumar explained in its response that it was unable to provide the financial statements to Commerce because it had no access to or control over Companies C and D, and therefore did not have access to those companies' account information or financial statements for the requested periods. *See* First Supplemental Response at 20 (C.R. 73).

Kumar explained further that Company D [

] and informed the Central Excise Department of India of its [

]. *See id.* at 19-20 (C.R. 73). Kumar also explained that there were no transactions between itself and Company C and D, whether related to glycine or any other merchandise during the POR. *See id.* at 21 (C.R. 73).

It is clear that Commerce would view any explanation regarding the lack of affiliation with Companies C and D with great skepticism. Commerce does not trust this company, as demonstrated by the history of the administrative reviews explained in this proceeding by Commerce itself. It should take greater causal link than mere skepticism, however, to justify the application of total facts available. Having been assigned a zero antidumping duty in the preliminary results, Kumar had no idea whatsoever until the Final Results that Commerce found its evidence suspect. Kumar was not aware that there were certain pieces of the puzzle that did not fit together perfectly, but the company certainly would have made its best effort to allay any contradictions in the record to Commerce's satisfaction. *See Meihua Group International*

20

PUBLIC VERSION

*Trading (Hong Kong), Ltd. v. United States*, 686 F. Supp. 3d 1359, 1370 (Ct. Int'l Trade 2024) ([b]ecause Commerce failed to notify Meihua of any deficiencies in its reported supplemental information and failed to give Meihua an opportunity to remedy or explain the deficiencies before determining that the use of facts otherwise available or adverse inferences was warranted, Commerce did not fulfill its statutory obligations under 19 U.S.C. § 1677e(a) and 19 U.S.C. § 1677m(d).")  In the instant case, Kumar cooperated fully in responding to the questions asked by Commerce and cannot be faulted for failing to explain discrepancies that were never brought to its attention.

### B.  Commerce's Determination to Assign a Rate of 28.59% to the Separate Rate Companies Is Not Supported by Substantial Evidence or Otherwise in Accordance with Law.

Although a request for an administrative review was filed with respect to Plaintiff Bajaj Healthcare, the company was not selected as a mandatory respondent and therefore has the status of a separate rate company in this proceeding.  The Tariff Act of 1930 ("the Act") does not establish any particular methodology that Commerce must use to calculate the separate rate.  *See Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1374 (Fed. Cir. May 20, 2013) ("*Bestpak*").  Commerce generally calculates the separate rate using the same method prescribed in 19 U.S.C. § 1673d(c)(5) for the calculation of the all-others rate (*i.e.* the rate assigned to non-individually examined respondents) *See id*. at 1373.

Pursuant to 19 U.S.C. § 1673d(c)(5)(A), Commerce calculates the all-others rate by taking the weighted average of the dumping margins assigned to the mandatory respondents, excluding any margins that are zero, de minimis, or determined entirely on the basis of facts available.  If all margins of the mandatory respondents are zero, de minimis, or determined based entirely on facts available, Commerce may use any reasonable method to calculate the all-others

178304341.1

PUBLIC VERSION

rate "including averaging the estimated weighted average dumping margins determined for exporters and producers individually investigated." 19 U.S.C. § 1673d(c)(5)(B). The calculation of the separate rate based on the weighted average of the mandatory respondents' margins is commonly referred to as the "expected method." *See Bestpak*, 716 F.3d at 1374.

The Statement of Administrative Action ("SAA") provides further clarification of 19 U.S.C. § 1673d. The SAA accompanied the 1995 amendments to the dumping statute and was recognized by Congress as an authoritative expression concerning the interpretation of the Tariff Act under 19 U.S.C. § 3512(d). *See Albermarle Corp. v. United States*, 821 F.3d 1345, 1351 (Fed. Cir. 2016). The SAA states that if the expected method under 19 U.S.C. § 1673d is "not feasible or it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers, Commerce may use other reasonable methods." H.R. Doc. No. 103-316, Vol. 1 at page 873 (1994).

In the instant case, Commerce has chosen to assign Bajaj Healthcare an antidumping rate that is equal to the simple average of the rates obtained by the two mandatory respondents. Those two rates were zero (assigned to Avid) and the total adverse facts available rate assigned to Kumar of 57.17%. Their simple average yields an exorbitant rate of 28.59%. *See* Final Results (P.R. 204). Bajaj Healthcare did not have the opportunity to contest this separate rate previously because Commerce had assigned it a rate of zero in the preliminary results. *See* Preliminary Results (P.R. 174). The final antidumping rate of 28.59% therefore came as a shock to this company that had never participated in a Commerce proceeding.

Commerce has an obligation to calculate a separate rate in a way that reasonably reflected the potential dumping margins of the separate rate companies. *See Bestpak*, 716 F.3d at 1374. Commerce's inclusion of the AFA rate of 57.17% in the separate rate calculation unfairly

22

PUBLIC VERSION

distorted the separate rate margin adversely due to the high rate assigned to Kumar. Bajaj had no control or responsibility for the issues that plagued Kumar. Yet, Bajaj Healthcare is being unfairly punished with an aberrational antidumping duty that does not bear any relationship to the rate that would have been expected in this proceeding for a separate rate company. *Id.* at 1380.

A fairer estimation of the separate rate that would be reasonable to assign to Bajaj Healthcare is the rate assigned to the one separate company in the immediately preceding administrative review of this antidumping duty order. In the administrative review covering the period June 1, 2021 to May 31, 2022, Commerce assigned the one separate rate company a margin of 5.29%, based on the calculated rate of the mandatory respondent Avid Organics. *See Glycine from India; Final Results of Administrative Review; 2021-2022*, 88 Fed. Reg. 77,752 (Nov. 13, 2023). Notably, the two mandatory respondents in the 2022-2023 POR subject to this appeal (Kumar and Avid) were both mandatory respondents in the 2021-2022 POR. Accordingly, the separate rate assigned in the prior review segment, which was not based in part on AFA, more reasonably reflects the dumping margin that would have been expected for a cooperative separate rate company in the 2022-2023 POR. Bajaj Healthcare urges the Court to instruct Commerce to adopt the same approach in this proceeding and assign it a rate of 5.29% because the rate of 28.59 percent, partially based on AFA, is simply not reflective of the potential dumping rate that would have been assigned to Bajaj Healthcare had it been individually investigated.

## V.     <u>CONCLUSION</u>

For the foregoing reasons, plaintiff Kumar respectfully requests that this Court find that Commerce's application of total AFA to Kumar was not supported by substantial evidence on

178304341.1

PUBLIC VERSION

the record and was otherwise not in accordance with law.  Plaintiff Bajaj Healthcare respectfully requests that this Court hold  that Commerce's determination of a separate rate margin in the amount of 28.59 is not supported by substantial evidence on the record and was not otherwise in accordance with law.

Respectfully submitted,

*/s/ Lizbeth R. Levinson*
Lizbeth R. Levinson
Brittney R. Powell

FOX ROTHSCHILD LLP
2020 K Street, NW
Suite 500
Washington, D.C.
Tel: (202) 794-1186
Fax: (202) 461-3102
Email: llevinson@foxrothschild.com

Dated: October 20, 2025

24

PUBLIC VERSION

## CERTIFICATE OF COMPLIANCE

The undersigned counsel at Fox Rothschild LLP hereby certifies that the foregoing brief complies with the word-count limitation in the Standard Chambers Procedure. This brief contains 7,351 words according to the word-count function of the word-processing software used to prepare the brief.  This is less than the 14,000 words permitted for Rule 56.2 Motion brief.

<div style="margin-left:40%">

Respectfully submitted,

*/s/ Lizbeth R. Levinson*

FOX ROTHSCHILD LLP
2020 K Street, NW
Suite 500
Washington, DC 20006
Phone:  202) 794-1186

*Counsel to Kumar Industries and Bajaj
Healthcare Limited*

</div>

October 20, 2025