PUBLIC VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| KUMAR INDUSTRIES AND BAJAJ HEALTHCARE LIMITED, | ) ) ) |
| | ) |
| Plaintiffs, | ) ) |
| | ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| DEER PARK GLYCINE, LLC., | ) ) |
| | ) ) |
| Defendant-Intervenor. | ) ) |

**CONFIDENTIAL VERSION**

Business proprietary information omitted at pages 3-15, 20-26, 28, 29

Court No. 25-00081

---

## DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Deputy Director

OF COUNSEL:
SAMUIL AGRANOVICH
Attorney
Office of the Chief
Counsel for Trade Enforcement
  & Compliance
U.S. Department of Commerce

COLLIN MATHIAS
Trial Attorney
Commercial Litigation Branch
United States Department of Justice
P.O. Box 480 | Ben Franklin Station
Washington, DC 20044
(202) 307-0315 | Collin.T.Mathias@usdoj.gov

January 30, 2026

Attorneys for the United States

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| KUMAR INDUSTRIES AND BAJAJ HEALTHCARE LIMITED, ) ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | |
| UNITED STATES, ) ) | Court No. 25-00081 |
| Defendant, ) ) | |
| and ) ) | |
| DEER PARK GLYCINE, LLC., ) ) ) | |
| Defendant-Intervenor. ) ) | |

### ORDER

Upon consideration of the plaintiffs' Rule 56.2 motion for judgment on the agency record, defendant's opposition, and all other pertinent papers, it is hereby

ORDERED that the plaintiffs' Rule 56.2 motion for judgment on the agency record is denied; and it is further

ORDERED that judgment shall issue for the United States.


Dated: _____
       New York, New York                          _____
                                                           JUDGE

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR JUDGMENT UPON
AGENCY RECORD ........................................................................................................ 1

STATEMENT PURSUANT TO RULE 56.2 ...................................................................... 2

     I.     Administrative Determination Under Review ......................................................... 2

     II.    Issues Presented For Review .................................................................................. 2

STATEMENT OF FACTS ................................................................................................. 3

SUMMARY OF THE ARGUMENT ................................................................................ 16

ARGUMENT .................................................................................................................... 17

     I.     Standard of Review ............................................................................................... 17

     II.    Commerce's Application of Adverse Facts Available Is Supported by Substantial
          Evidence and Is Otherwise in Accordance with Law ........................................... 18

          A.  Legal Framework ........................................................................................ 18

          B.  Commerce Properly Used Facts Otherwise Available for Kumar ................. 19

          C.  Kumar Failed To Cooperate By Not Acting to the Best of its Ability ........... 27

          D.  Commerce Notified Kumar of its Deficient Responses and Provided Kumar
              Opportunities To Remedy Them ................................................................... 30

     III.   Commerce Properly Calculated the Non-Selected Company Rate Applied To
          Bajaj .................................................................................................................... 33

          A.  Bajaj Waived Any Argument that Commerce Did Not Meet its Burden To
              Deviate from the Expected Method ............................................................. 35

          B.  There Is No Evidence that Pulling Forward the Previous All-Others Rate
              Would Be Reasonable ................................................................................. 36

     CONCLUSION ...................................................................................................... 38

PUBLIC VERSION

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*ABB Inc. v. United States*,
   355 F. Supp. 3d 1206 (Ct. Int'l Trade 2018) ............................................................. 32

*Albemarle Corp. & Subsidiaries v. United States.*,
   821 F.3d 1345 (Fed. Cir. 2016) ................................................................... 33, 36, 37

*Alegheny Ludlum Corp. v. United States*,
   346 F.3d 1368 (Fed. Cir. 2003) ......................................................................... 37

*Atl. Sugar, Ltd. v. United States*,
   744 F.2d 1556 (Fed. Cir. 1984) ......................................................................... 17

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*,
   5 F.4th 1367 (Fed. Cir. 2021) ......................................................................... 17

*Bosun Tools Co. v. United States*,
   2022 WL 94172 (Fed. Cir. Jan. 10, 2022) .............................................................. 35

*Changzhou Hawd Flooring v. United States*,
   848 F.3d 1006 (Fed. Cir. 2017) ......................................................................... 37

*Cleo Inc. v. United States*,
   501 F.3d 1291 (Fed. Cir. 2007) ......................................................................... 18

*CME Acquisitions, LLC v. United States*,
   793 F. Supp. 3d 1375 (Ct. Int'l Trade 2025) ...................................................... 35, 37

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966) ......................................................................... 17

*Cooper Kushan Tire Co. v. United States*,
   539 F. Supp. 3d 13168 (Ct. Int'l Trade 2021 ........................................................... 35

*Corinth Pipeworks Pipe Indus. SA v. United States*,
   154 F.4th 1356 (Fed. Cir. 2025) ...................................................................... 26, 27

*De Laval Separator Co. v. United States*,
   511 F. Supp. 810 (Ct. Int'l Trade 1981) ............................................................... 35

*Essar Steel Ltd. v. United States,*
    678 F.3d 1268 (Fed. Cir. 2012) ......................................................................... 30

*Ferrostaal Metals GmbH v. United States,*
    518 F. Supp. 3d 1357 (Ct. Int'l Trade 2021) .................................................... 29

*Fujian Lianfu Forestry Co., Ltd. v. United States,*
    638 F. Supp. 2d 1325 (Ct. Int'l Trade 2009) .................................................... 36

*Fujitsu Gen. Ltd. v. United States,*
    88 F.3d 1034 (Fed. Cir. 1996) .......................................................................... 17

*Gerber Food (Yunnan) Co., Ltd. v. United States,*
    387 F. Supp. 2d 1270 (Ct. Int'l Trade 2005) .................................................... 25

*Hyundai Electric & Energy Systems Co., Ltd. v. United States,*
    617 F. Supp. 3d 1253 (Ct. Int'l Trade 2023) .................................................... 24

*INS v. Elias-Zacarias,*
    502 U.S. 478 (1992) .......................................................................................... 17

*Kumar Industries v. United States,*
    *(Kumar I)*, 665 F. Supp. 3d 1355 (Ct. Int'l Trade 2023) ................................. 1, 21, 26

*Kumar Industries v. United States,*
    *(Kumar II)*, 779 F. Supp. 3d 1329 (Ct. Int'l Trade 2025) ................................. passim

*Maverick Tube Corp. v. United States,*
    857 F.3d 1353 (Fed. Cir. 2017) ................................................................... 31, 32

*Meihua Group International Trading (Hong Kong), Ltd. v. United States,*
    686 F. Supp. 3d 1359 (Ct. Int'l Trade 2024) .................................................... 32

*MTZ Polyfilms, Ltd. v. United States,*
    659 F. Supp. 2d 1303 (Ct. Int'l Trade 2009) .................................................... 36

*Mukand Ltd. v. United States,*
    767 F.3d 1300 (Fed. Cir. 2014) ........................................................................ 24

*Nan Ya Plastics Corp. Ltd. v. United States,*
    810 F.3d 1333 (Fed. Cir. 2016) ........................................................................ 19

*National Knitwear & Sportswear Ass'n v. United States*,
    779 F. Supp. 1364 (Ct. Int'l Trade 1991) ............................................................ 33

*New Mexico Garlic Growers Coalition v. United States*,
    352 F. Supp. 3d 1281 (Ct. Int'l Trade 2018) ....................................................... 32

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) ........................................................................... 18

*Nippon Steel v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003) ........................................................................... 19

*NTN Bearing Corp. v. United States*,
    74 F.3d 1204 (Fed. Cir. 1995) ....................................................................... 26, 27

*PrimeSource Bldg. Prods. v. United States*,
    111 F.4th 1320 (Fed. Cir. 2024) .................................................................... 34, 37

*PrimeSource Bldg. Prods. v. United States*,
    581 F. Supp. 3d 1331 (Ct. Int'l Trade 2022) ....................................................... 34

*Rhone Poulenc, Inc. v. United States*,
    899 F.2d 1185 (Fed. Cir. 1990) ........................................................................... 37

*Saha Thai Steel Pipe Pub. Co. Ltd. v. United States*,
    663 F. Supp. 3d 1356 (Ct. Int'l Trade 2023) ....................................................... 32

*Shandong Dongfang Bayley Wood Co. v. United States*,
    375 F. Sup. 3d 1339 (Ct. Int'l Trade 2019) ......................................................... 31

*United States v. Eurodif S.A.*,
    555 U.S. 305 (2009) ............................................................................................. 17

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
    716 F.3d 1370 (Fed. Cir. 2013) ..................................................................... 33, 34

**Statutes**

19 U.S.C. § 1677e ........................................................................................... passim

19 U.S.C. § 1673 .................................................................................. 17, 33, 34

19 U.S.C. § 1673d .................................................................................... 33, 35

PUBLIC VERSION

19 U.S.C. § 1677m..................................................................................................... 18, 30, 32

**<u>Regulations</u>**

19 C.F.R. § 351.403(c)...................................................................................................... 20

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| KUMAR INDUSTRIES AND BAJAJ HEALTHCARE LIMITED, | ) ) ) **CONFIDENTIAL VERSION** |
| Plaintiffs, | ) ) ) Contains business proprietary |
| v. | ) information at pages 3-15, 20-26, 28, 29 ) |
| UNITED STATES, | ) ) Court No. 25-00081 |
| Defendant, | ) |
| and | ) ) |
| DEER PARK GLYCINE, LLC., | ) ) |
| Defendant-Intervenor. | ) ) ) ) |

### DEFENDANT'S RESPONSE TO PLAINTIFFS'
### MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of United States Court of International Trade, defendant, the United States, respectfully submits this response in opposition to the motion for judgment on the administrative record filed by the plaintiffs, Kumar Industries (Kumar) and Bajaj Healthcare Limited (Bajaj) (collectively, plaintiffs).  ECF Nos. 33-34.

Kumar's challenge involves the third administrative review of the antidumping duty order of glycine from India.  Yet again, Kumar challenges the Department of Commerce's application of facts otherwise available with an adverse inference based on Kumar's inconsistent and inadequate reporting related to affiliation with other companies.  *See Kumar Industries v. United States (Kumar I)*, 665 F. Supp. 3d 1355 (Ct. Int'l Trade 2023); *Kumar Industries v. United States (Kumar II)*, 779 F. Supp. 3d 1329 (Ct. Int'l Trade 2025).  Meanwhile, Bajaj

1

challenges Commerce's calculation of its rate as a non-selected respondent. As demonstrated below, the challenged determination is supported by substantial evidence and is otherwise in accordance with law. Accordingly, we respectfully request that the Court deny plaintiffs' motion for judgment upon the agency record and sustain Commerce's determination.

## STATMENT PURSUANT TO RULE 56.2

### I.    Administrative Determination Under Review

The administrative determination under review is *Glycine from India: Final Results of Antidumping Duty Administrative Review; 2022–2023*, 90 Fed. Reg. 15,689 (Dep't of Commerce April 15, 2025) (P.R. 204)[1] (*Final Results*), and accompanying Issues and Decision Memorandum (IDM) (P.R. 202). The period of review (POR) is June 1, 2022, through May 31, 2023.

### II.    Issues Presented for Review

1.      Whether Commerce's application of facts otherwise available with an adverse inference (AFA) to Kumar based on its failure to resolve discrepancies in the record identified by Commerce in its supplemental questionnaires is supported by substantial evidence and is otherwise in accordance with law.

2.      Whether Commerce's calculation of a separate rate for Bajaj based upon the simple average of Kumar's rate derived from the application of AFA and the zero rate of the other mandatory respondent, Avid Organics Private Limited (Avid), was supported by substantial evidence and in accordance with law.

---

[1] "P.R." refers to documents from the public record index, and "C.R." refers to documents from the confidential record index. ECF No. 22.

## STATEMENT OF FACTS

In August 2023, Commerce initiated an administrative review of the antidumping duty order on glycine from India.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 51,271, 51,274 (Dep't of Commerce Aug. 3, 2023) *(Initiation Notice)* (P.R. 13).  Commerce selected Avid and Kumar for individual examination as mandatory respondents.  *See* Respondent Selection Memorandum (Aug. 24, 2023) (PR. 21, C.R. 3).  Bajaj was a respondent not selected for individual examination in the administrative review. *See Initiation Notice*, 88 Fed. Reg. at 51,274.

*i.   Commerce's Initial Questionnaire to Kumar*

Commerce then issued an initial questionnaire to Avid and Kumar.  *See* Initial Questionnaire (Aug. 24, 2023) (P.R. 17, 19).  In the initial questionnaire, Commerce requested information about Kumar's affiliates as well as about Kumar itself.  *Id.* at A-3. Commerce provided a detailed definition of "affiliated persons," *id.* at Appendix I I-1 – I-2, and requested that Kumar provide information on its business ownership, organization, and structure, including that of any affiliates.  *Id.* at A-3 – A-6.  Kumar identified certain affiliates and provided documentation concerning them, as well as a list of Kumar's partners and their purported share in group companies as of May 31, 2023.  *See* Initial Questionnaire Response at 5-6, Exhibit A-3, A-3(a), and A-4 (Oct. 5, 2023) (P.R. 40, 41 C.R. 8, 10).  Kumar's response listed [████████ █████████████████████████████████████████]² *Id.*

In multiple preceding reviews, Kumar had indicated that Companies A and B were prior affiliates that had dissolved their relationships with Kumar; however, Commerce found evidence

---

² In the underlying review, we referred to [████████████] as Company A, [███████████████] as Company B, [████████████████████] as Company C, and [██████████████████] as Company D.

in those reviews suggesting that they were still affiliated, leading to the application of AFA to Kumar. *See Kumar II*, 779 F. Supp. 3d at 1337-38; *see also Glycine from India: Final Results of Antidumping Duty Administrative Review; 2018-2020*, 86 Fed. Reg. 62,508 (Dep't of Commerce Nov. 10, 2021), and accompanying IDM (2018-2020 IDM) at 28-32; and *Glycine from India: Final Results of Antidumping Duty Administrative Review; 2020–2021*, 87 Fed. Reg. 67,870 (Dep't of Commerce Nov. 10, 2022), and accompanying IDM (2020-2021 IDM) at 5-6. But in *this review*, Kumar stated in its initial questionnaire response that Kumar had become affiliated with Company A and Company B as of April 1, 2023, near the end of this 2022-23 POR, and noted that this was "a change from the prior POR's where Kumar was not affiliated and did not control such entities." *See* Initial Questionnaire Response at 6 (P.R. 40, C.R. 8).

Also in the initial questionnaire response, Kumar stated that its partners submitted a resignation letter in the year [▮▮▮] with respect to Company C and Company D, but due to a business dispute between the [▮▮▮▮▮▮] and the Borad family, Kumar had not begun "the process of striking off of the names" of Company C and Company D "from the register of companies." *See* Initial Questionnaire Response at 8 and Exhibit A-3 (P.R. 40, 41 C.R. 8, 10). Kumar stated that the "Company Act 2013, India" prevents it from striking companies "from the records" while there are ongoing disputes. *Id.* at 8. Kumar further stated that Company C is primarily involved in the "[▮▮▮▮▮▮▮▮▮▮]," but that Company D had "[▮▮▮▮▮▮▮▮▮▮▮▮▮▮]." *Id.* at Exhibit A-3. Kumar claimed that none of the affiliate companies listed in Exhibit A-3 are engaged in the development, production, sale, or distribution of glycine. *Id.* at 7.

Following Kumar's questionnaire responses, GEO Specialty Chemicals, a domestic producer participating in the proceeding, provided evidence that on [▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████ ] Company B had [ ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██ ]. *See* GEO's October Comments on Kumar's Section A Questionnaire Response at 3, 14, and

Exhibit 1 (Oct. 26, 2023) (P.R. 53 C.R. 20) (GEO's October Comments); *see also* GEO's

December Comments on Kumar's Section B, C, and D Questionnaire Response at 8 and Exhibit

5 (Dec. 15, 2023) (P.R. 72 C.R. 42, 43) (GEO's December Comments).

    ii.    *Commerce's First Supplemental Questionnaire Seeking More Regarding Affiliation*

In response to this potentially contradictory information, Commerce issued a

supplemental questionnaire to Kumar with questions addressing Kumar's affiliation with

Companies A and B.  *See* First Supplemental Questionnaire (Feb. 27, 2024) (P.R. 82, C.R. 47).

Commerce also reminded Kumar that it had applied total AFA to Kumar in the June 1, 2020 –

May 31, 2021 administrative review of the order based on contradictory information contained in

Kumar's responses and in certain retirement deeds for Companies A and B.  *See* First

Supplemental Questionnaire at 6 (P.R. 82, C.R. 47).  Specifically, Commerce had found that

Kumar had not supported its assertion that it was not affiliated with Companies A and B using a

[                                        ] *Id.*

However, GEO's comments showed that the signature of [ ██████████████████████

████████████████████████████████████████████

████████████████████████████ ].  *See* GEO's October Comments at Exhibit 3 (P.R. 53

C.R. 20).  Commerce also noted in its First Supplemental Questionnaire that while Kumar claims

to have only become affiliated with Company A on April 1, 2023, in the [ ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████ ].  *See* First Supplemental

Questionnaire at 7 (P.R. 82, C.R. 47); *see also* Kumar's Section A Questionnaire Response at

Exhibit A-3; GEO's December Comments at 9-10 and Exhibit 7 (C.R. 44).  Commerce asked

Kumar to provide Company A and Company B's audited annual financial statements for the

period of review, to explain why [████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

███████ ], [ ██████████████████████████████

███████████████████████████████████████

███████████████████████████████ ], and to explain the circumstances

regarding these retirement deeds.  *See* First Supplemental Questionnaire at 6-9 (P.R. 82, C.R.

47).

Also in its supplemental questionnaire, Commerce asked questions addressing Kumar's

affiliation with Companies C and D.  *Id.* at 9.  Commerce noted that GEO had placed on the

record 2019-2020 financial statements of Company D which [████████████████

████████████████████████████████████████████ ].  *See id.*;

*see also* GEO's October Comments at 10 and Exhibit 5 (P.R. 53 C.R. 20).  This financial

statement also identifies Company B as an affiliate of Company D.  *See* First Supplemental

Questionnaire at 11 (P.R. 82, C.R. 47); *see also* GEO's October Comments at 11 and Exhibit 5

(P.R. 53 C.R. 20).  Commerce also noted that [████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████ ].  *See* GEO's October Comments at

**PUBLIC VERSION**

10 and Exhibit 6 (P.R. 53 C.R. 20).  Significantly, Company D [████████████████

████████████████████████████████████████████████████████████

██].  *See id.* at Exhibit 6.  Commerce asked Kumar to provide Company C and D's audited

annual financial statements for the period of review, to explain which [████████████]

produces or produced, and explain the circumstances of how Kumar's partners allegedly divested

their interests in Company D in light of [████████████████████████████

████████████████████████].  *See* First Supplemental Questionnaire at 9-10 (P.R.

82, C.R. 47).

On April 1, 2024, Kumar attempted to address these incongruities in its supplemental

questionnaire response.  *See* Kumar's First Supplemental Questionnaire Response (April 1,

2024) (P.R. 106, C.R. 73).  Kumar claimed that although [████████████████

████████████████████████████████████████

████████████].  *See id.* at 11 and Exhibit A-18 (P.R. 108, C.R. 76).  Kumar explained

that Company A [████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████].  *See id.* at 12-13.  Kumar claimed that it did not

have access and control over the books of accounts and financial statements of Companies A and

B from before April 1, 2023, and so could not provide them to Commerce.  *See id.* at 9 and 15.

In response to Commerce's questions relating to the retirement deeds signed by [████████

████████████], Kumar based its answer on information it had provided in the second

administrative review, where it received a rate based on total AFA, stating that [████████

7



____ ]. *See id.* at 16-17.  But Kumar did not offer an explanation for [_____

_____

_____ ].  *Id.* at 16-17.

Further, Kumar disclaimed affiliation with Companies C and D.  *Id.* at 19-20.  Kumar

claimed that its partners do not have equity ownership rights in Company D.  *Id.* at 19.  And

Kumar stated that while it knows that Company C manufactures [_____ ], "Kumar is not

aware about the detailed information that which [_____ ] it produces or produced," and that it

cannot provide the financial statements of Companies C or D because it lacks access and control

over their books of accounts.  *See id.* at 19-20.  Kumar continued to allege that its partners had

resigned from Company D in the year [_____

_____ ]

and that Company D closed its operations by [_____

_____

_____ ].  *See id.* at 19-20; *see also* GEO's October Comments at 10 and

Exhibits 5-6 (P.R. 53 C.R. 20).

   iii.   *Commerce Directs Kumar to Address Discrepancies in Second Supplemental
          Questionnaire*

        Unsatisfied with Kumar's First Supplemental Questionnaire Response, Commerce

followed up with a second supplemental questionnaire.  *See* Second Supplemental Questionnaire

(May 17, 2024) (P.R. 143, C.R. 128).  In this second questionnaire, Commerce specifically noted

that Kumar "failed to '{f}ully explain the circumstances of these events (the circumstances by

which {Company B} came to be owned in common by the common owners/partners of each

company and came to share each of the common directs/managers of each company) in detail."

*See id.* at 6. Commerce also reiterated its request for the audited financial statements of Companies A and B, further asking why Kumar would not have access to these records given that [████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████]. *See id.* at 8.

     Commerce once again requested that Kumar explain fully the circumstances of how Kumar's partners came to becoming partial owners of Companies A and B, including: the form and amount of remuneration provided by Kumar's partners to the Borad family for ownership of Companies A and B; why Company B did not change the "signing authority" on record with government departments from [██████████████████████████████████████████████████

████████████████████████████████] Company B in 2020; and what motivation [████████████████████] had in signing the environmental clearance "as a 'partner.'" *See id.* at 6-8, 9-10. Commerce also asked again how [████████████████████████████████████

████████████████████████████████████████████████████], specifically noting that Kumar "failed to reconcile this discrepancy." *See id.* at 8-9. Commerce also noted that Kumar explained "the legal principle by which it is possible for" [██████████████

████████████████████] to be the same address as several of Kumar's other affiliates, but that Kumar "failed to fully explain the specific proximate reason why" this is the case. *See id.* at 11.

     Commerce also solicited additional information as to Kumar's potential affiliation with Companies C and D. *See id.* at 12-13. Specifically, Commerce identified the fact that one of Kumar's affiliates had an [████████████████████████████████████████████] "Borad Family" [████████████████████] even though the alleged reason why Kumar could not begin the process of "striking off the names {of Companies C and D} from the register of companies" is

because the Borad family is in a business dispute with the [█████████]. *See id.* at 12; *see also* Kumar's First Supplemental Questionnaire Response at Exhibit A-18 and A-25 (C.R. 79). Given this incongruity, Commerce asked Kumar to explain "why the Borad family [███████ ███████████████████████████████████████████████████ █████████████████████████████████████████████████]," how the [█████████████████████████████████████████ ██████], and what the nature of nature of the business dispute is. *See* Second Supplemental Questionnaire at 13 (P.R. 143, C.R. 128). Commerce additionally asked, in response to Kumar's claim that it does not know what Company C produces or produced, how it is possible that Kumar "can lack knowledge of the operations of an affiliate that Kumar shared directors/partners with;" and in response to Kumar's claim that they do not have access or control over Companies C and D's audited financial statements, asked if Kumar has any knowledge of Companies C or D having 2021-2022 or 2022-2023 financial statements, and if so, whether any affiliate of Kumar's had helped sign or prepare such documents. *See id.* at 13-14.

After receiving the second supplemental questionnaire, Kumar requested four extensions to submit responses, ultimately moving the deadline from May 20, 2024, until June 7, 2024, in order to explain, among other things, why Kumar was unable to provide the audited financial statements for Companies A and B even though [██████████████████████████ ███████████████████]. *See* Kumar's First Extension Request (May 16, 2024) (P.R. 142); Kumar's Second Extension Request (May 26, 2024) (P.R. 146); Kumar's Third Extension Request (June 3, 2024) (P.R. 149); Kumar's Fourth Extension Request (June 6, 2024) (P.R. 155); Letter Granting Fourth Extension (June 6, 2024) (P.R. 158).

Kumar's second supplemental questionnaire responses again failed to address the incongruities in the record identified by Commerce. *See* Kumar's May 28, 2024 Second Supplemental Response (May 28, 2024) (P.R. 147, C.R. 129); *see also* Kumar's June 4, 2024 Second Supplemental Response (June 4, 2024) (P.R. 152, C.R. 135); and Kumar's June 6, 2024 Second Supplemental Response (June 6, 2024) (P.R. 157, C.R. 138).  On May 28, 2024, Kumar revealed for the first time that they had purchased [███████████████████████ ████████████████████████████████████ ] *See* Kumar's May 28, 2024 Second Supplemental Response at 6, 15-16 (P.R. 147 C.R. 129).  In this response, Kumar also revealed for the first time that in [████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████ ]. *See id.* at 16.  [███████████████████████████████████████ ███████████████████████████ ] *Id.*  Kumar then also claimed that [████████████████ ] had no involvement with [████████████████████████ ███ ] that [███████████████████████████████████ ████████████████ ] and that his motivation for doing so "stems from his deep sense of responsibility, commitment to the company's compliance and success, and his ongoing influence and dedication even after retirement." *See* Kumar's May 28, 2024 Second Supplemental Response at 9 (P.R. 147 C.R. 129).

Kumar further explained that while there is a process for changing the "signing authority" on record with the government in Gujarat, that it involves "extensive paperwork in their working procedures, including various forms and formalities that not everyone is familiar with." *See id.* at 7.  In response to Commerce's question as to how [██████████████████████████

11

████████████████████████████], Kumar claimed that "it had duly

explained the situation in the first supplemental questionnaire" and proceeded to quote the

entirety of its original answer once more.  *See id*. at 11-12; *see also* Kumar's First Supplemental

Questionnaire Response at 16-17 (P.R. 106 C.R. 73).  In responding to Commerce's request that

Kumar explain "the specific proximate reason why [████████████████████████]

is the address used by various Kumar affiliates," Kumar simply stated that "Kumar had duly

explained this in 1st SQR."  *See* Kumar's May 28, 2024 Second Supplemental Response at 17-18

(P.R. 147 C.R. 129).

     Further, in response to Commerce's questions regarding Companies C and D, Kumar

stated that its partners [████████████████████████] before or during

the POR, in spite of the fact that they had stated in their Supplemental Questionnaire Response

that Kumar became affiliated with [████████████████████████████

████████████████████████████], and that its

partners are [████████████████████].  *See id* at 19.  When asked why the

Borad family would continue [████████████████████████████

████████████████████████] Kumar

responded that the scope of the dispute focused on [████████████] and that this conflict

"may involve financial, managerial, or ownership issues," but [████████████████

████████████████].  *See id.* at 20-21.  When asked to fully explain the nature of this

dispute, Kumar did not elaborate on its prior explanation, instead stating that it had "already

explained and reported in the {First} Supplemental Questionnaire" and that it could not provide

any supporting documentation because the "dispute is complex involving both personal and

financial dimension."  *See id*. at 21.  In response to Commerce's efforts to determine [████

███████████████████████████ ], Kumar quoted its answer from its First

Supplemental Questionnaire response and stated that since [ ████ ] it has [ ████████████

████████████ ] of Company C.  *See id.* at 22.  Kumar also stated that it has [ ████████ ]

regarding [ ███████ ] 2021-2022 and 2022-2023 fiscal year financial statements.  *See id.* at

23.

      Further, in the May 28, 2024 Second Supplemental Response, Kumar stated that it

would respond to Commerce's requests for Companies A and B's audited financial statements

based "on the extended timeline submitted" in their First Extension Request.  *See id.* at 10; *see*

*also* Kumar's First Extension Request (P.R. 142).  When Kumar did respond to Commerce's

request on June 4, 2024, Kumar claimed that it "is [ █████ ] to access the financial statements of

{Companies A and B}, despite their significant ownership and control by the [ ████████ ]"

because their recent affiliation had "evidently constrained their ability to retrieve financial data

predating this affiliation."  *See* Kumar's June 4, 2024 Second Supplemental Response at 1-2

(P.R. 152 C.R. 135).  Kumar finally provided Commerce with the requested financial statements

on June 6, 2024.  *See* Kumar's June 6, 2024 Second Supplemental Response at 1 (P.R. 157 C.R.

138).

      This delayed Commerce's ability to analyze the information contained in the financial

statements, resulting in a Third Supplemental Questionnaire relating to [ ███████ ].  *See* Third

Supplemental Questionnaire (June 25, 2025) (P.R. 166 C.R. 148).  This also meant that

Commerce was unable to consider the information in Kumar's Third Supplemental Response in

its *Preliminary Results*, instead noting that "we have issued a supplemental questionnaire to

Kumar to collect additional information, a response to which is outstanding."  *See Glycine From*

*India: Preliminary Results and Rescission, In Part, of Antidumping Duty Administrative Review;*

*2022-2023*, 89 Fed. Reg. 55,565 (Dep't of Commerce Jul. 5, 2024) (*Preliminary Results*) (P.R.

168) and accompanying Preliminary Decision Memorandum (PDM) (P.R. 169).

    *iv.*      *Commerce Issues Preliminary and Final Results*

       On July 5, 2024, Commerce published the preliminary results.  *See Preliminary Results*.

In the *Preliminary Results,* Commerce preliminarily determined that Kumar was affiliated with

Companies A and B and relied on the record information provided to calculate a zero percent

dumping rate for Kumar and Avid.  *See Preliminary Results*, 89 Fed. Reg. at 55,566; *see also*

PDM at 3-4.  Because both mandatory respondents received a calculated rate of zero percent,

Bajaj received a non-selected company rate of zero percent as well.  *See Preliminary Results*, 89

Fed. Reg. at 55,566.

       On August 5, 2024, Deer Park Glycine, LLC (DPG), a domestic petitioner, submitted an

administrative case brief arguing that Commerce should apply total AFA to Kumar because

Kumar's responses concerning its affiliation with Companies A and B contained contradictions,

because Kumar delayed responding to Commerce's inquiries regarding Companies A and B, and

because Kumar did not respond to Commerce's questions regarding Companies C and D.  *See*

DPG's Administrative Case Brief at 2-28 (Aug. 5, 2024) (P.R. 181 C.R. 167).  Kumar filed a

rebuttal brief, asserting that Commerce should not apply AFA.  *See* Kumar's Administrative

Rebuttal Brief at 1-3 (Aug. 13, 2024) (P.R. 192 C.R. 169).

       On April 15, 2025, Commerce published the final results.  *Final Results*, 90 Fed. Reg.

15,689.  After considering the comments, Commerce decided to apply total AFA to Kumar.  *See*

IDM at 6-13.  Commerce explained that necessary information regarding Kumar's affiliation

with Companies A, B, C, and D was not available on the record, and that Kumar withheld

requested information, failed to provide information by specified deadlines, and significantly

impeded the proceeding by failing to provide information and documents substantiating its

claims of non-affiliation.  *See id.* at 7-9.  As a result, Commerce determined that it was

appropriate to rely on facts otherwise available to calculate Kumar's rate, pursuant to 19 U.S.C.

§ 1677e(a).  *Id.* at 9.  Further, in light of the failure to provide adequate documents or otherwise

explain conflicting record data with Kumar's claims, Commerce found Kumar's "databases to be

unreliable for purposes of calculating an accurate dumping margin."  *Id.*  Accordingly,

Commerce determined that an adverse inference, pursuant to 19 U.S.C. § 1677e(b)(1), was

appropriate.  *Id.* at 10-12.

Commerce also released a confidential memorandum that went into more detail.  *See*

AFA Memo (April 23, 2025) (P.R. 205, C.R. 172).  Commerce explained that it found many

contradictions between submitted record evidence and Kumar's claims of non-affiliation.  *See id.*

For example, as Commerce explained, according to Kumar's reporting, [███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████].  *See* AFA Memo at 3

(P.R. 147 C.R. 129).  For these reasons and all other contradictory record information,

Commerce found the application of total AFA appropriate.  *Id.* at 1.

Kumar and Bajaj then brought this action, challenging Commerce's application of an

adverse inference as well as the decision to assign Bajaj the simple average of Kumar and Avid's

rates.  Kumar states in its complaint that "{d}uring the POR, Company A purchased a substantial

portion of Kumar's home market sales of glycine" and that "Kumar purchased from Company B

a substantial portion of its inputs used in the production of glycine, including ammonia, hexamine, and monochloro acetic acid." *See* Complaint at 3, ECF No. 11.[3]

## <u>SUMMARY OF THE ARGUMENT</u>

Commerce's application of AFA to Kumar is supported by substantial evidence and in accordance with law. Commerce properly determined AFA was warranted because Kumar could not resolve the numerous contradictions in its reporting. This meant that necessary information concerning Kumar's affiliation with Companies A, B, C, and D was not available on the record. Commerce further determined that by failing to resolve these contradictions, Kumar had withheld requested information, failed to provide information by the established deadlines, and significantly impeded this administrative review. Each of these findings independently supports the use of facts otherwise available pursuant to 19 U.S.C. § 1677e(a).

Commerce further correctly applied an adverse inference, pursuant to § 1677e(b), when selecting from among the facts otherwise available because Kumar, in refusing to provide adequate responses concerning its affiliations with Companies A, B, C, and D, failed to cooperate by not acting to the best of its ability. Further, by sending two supplemental questionnaires to Kumar identifying extensive issues, Commerce fully satisfied its duty to notify Kumar of its deficient responses and provide it an opportunity to remedy the responses.

---

[3] This is at odds with record evidence and with Kumar's subsequent statement of facts in its motion for judgment on the administrative record, in which Kumar asserts that "Kumar did not make any sales of glycine or purchase glycine or any inputs used in the production of glycine from Companies A and B, or any other affiliate, during the POR." *See* Pl. Br. at 5; Kumar's First Supplemental Questionnaire Response at 8 and 14 (P.R. 106 C.R. 73). It is unclear if Kumar's statement in the complaint is a mistake or an inadvertent first-time admission.

Finally, Commerce's determination to assign the simple average of Kumar and Avid's dumping margins to Bajaj pursuant to 19 U.S.C. § 1673(c)(5)(B) is supported by substantial evidence and in accordance with law.

## ARGUMENT

### I.    Standard of Review

The Court sustains any determination, finding, or conclusion by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)); *see also United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009) ("The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence."). Substantial evidence is "'more than a mere scintilla' and 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' taking into account the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Further, when Congress entrusts an agency to administer a statute that demands inherently fact-intensive inquiries, agency conclusions may be set aside only if the record is "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *see also Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*, 5 F.4th 1367, 1374 (Fed. Cir. 2021) (explaining that this "highly deferential review standard recognizes Commerce's special expertise in antidumping duty

17

investigations," and that Federal Circuit affords "tremendous deference" to Commerce's administration of antidumping laws).  It is thus improper to overturn a determination "simply because the reviewing court would have reached a different conclusion based on the same record." *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted).  A party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal."  *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted).

## II.    Commerce's Application of Adverse Facts Available Is Supported by Substantial Evidence and Is Otherwise in Accordance with Law

Commerce's application of AFA to Kumar is supported by substantial evidence and in accordance with law.  First, Commerce properly determined the use of facts otherwise available was warranted because necessary information was not available on the record, and that Kumar withheld requested information, failed to provide information by the established deadlines, and significantly impeded this administrative review consistent with 19 U.S.C. § 1677e(a)(1), (2)(A)-(C).  Second, Commerce reasonably determined that Kumar failed to cooperate by not acting to the best of its ability with Commerce's requests for affiliation information.  Finally, Commerce provided ample notice to Kumar of its deficient responses and provided it an opportunity to remedy its response in accordance with 19 U.S.C. § 1677m(d).

### A.  Legal Framework

Commerce will rely on facts otherwise available to reach the applicable determination if "necessary information is not available on the record," 19 U.S.C. § 1677e(a)(1), or if an interested party: "(A) withholds information that has been requested by {the Department}; (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to {19 U.S.C. § 1677m (c)(1) and (e)}; (C) significantly

18

impedes a proceeding under the antidumping statute; or (D) provides such information but the information cannot be verified as provided for in section {1677m(i)}." 19 U.S.C. § 1677e(a)(2)(A)-(D).

Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available" if it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information{.}" 19 U.S.C. § 1677e(b)(1). This standard "requires the respondent to do the maximum it is able to do." *Nippon Steel v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). "The statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent." *Id.* Pursuant to this standard, it is irrelevant whether the respondent was intentionally evasive or whether respondent thought it had a valid legal basis for withholding the information requested of it. *See Nan Ya Plastics Corp. Ltd. v. United States*, 810 F.3d 1333, 1347 (Fed. Cir. 2016) ("Congress decided what requirements Commerce must fulfill in reaching its determinations, § 1677e(b), and we do not impose conditions not present in or suggested by the statute's text.").

## B. Commerce Properly Used Facts Otherwise Available for Kumar

In accordance with the statute, Commerce first determined whether the use of facts otherwise available was warranted. *See* IDM at 6-10. Commerce made that determination by reasonably finding that necessary information was missing from the record, and that Kumar had withheld requested information, failed to provide it by the deadline, and significantly impeded the administrative review. *Id.* Accordingly, Commerce found that all of the following bases for applying facts otherwise available pursuant to 19 U.S.C. § 1677e(a)(1) and (a)(2)(A)-(C) were

satisfied, though any one of those bases would be sufficient.  This determination was amply supported by record evidence and should be sustained.

Commerce repeatedly requested information from Kumar concerning whether Companies A, B, C, and D were affiliated with Kumar during the period of review, the circumstances of Kumar's alleged new affiliation with Companies A and B, and the details on the [

      ] relationship to the Borad family.  *See* Initial Questionnaire at A-3 – A-6 (P.R. 19); *see also* First Supplemental Questionnaire at 5-11 (P.R. 82, C.R. 47); and Second Supplemental Questionnaire at 6-14 (P.R. 143, C.R. 128).

"{I}nformation about potential affiliates is fundamental for Commerce to calculate the dumping margin."  *Kumar II*, 779 F. Supp. 3d at 1340.  Distinguishing transactions with unaffiliated entities from transactions with affiliated entities is essential for accurately calculating the normal value of subject merchandise.  *See* 19 C.F.R. § 351.403(c).  In past administrative reviews of this order, Commerce has repeatedly found that Kumar has provided inadequate and conflicting information concerning its affiliation.  *See Kumar II*, 779 F. Supp. 3d at 1337.  Although this is the first time that Kumar has admitted to some affiliation with Companies A and B, the same reporting issues continue to resurface here.  In those past reviews, Kumar had provided the retirement deeds indicating Companies A and B had dissolved their affiliation with Kumar, but the deeds were contradicted by other record evidence.  *See* 2018-2020 IDM at 28-29 (Kumar's partner's tax returns showed receipt of income from Companies A and B during period of review); 2020-2021 IDM at 5-6 (evidence in record suggested Kumar's partners had not resigned from positions as partners in Companies A and B, contrary to Kumar's representations).

Nonetheless, Kumar failed to resolve the continued discrepancies in its reporting here, instead continuing to rely on information that Commerce had already deemed deficient in prior administrative reviews. Kumar failed to explain the discrepancy between [█████████ ████████████████████████████████████████████████████████ ] and [███████████████████████████████████████████████████ ██████████████ ], instead submitting the same response it provided in the 2020-2021 administrative review where Commerce previously applied AFA to Kumar. *See* Kumar's May 28, 2024 Second Supplemental Response at 8-9 (P.R. 147 C.R. 129); *see also* AFA Memo at 4 (P.R. 205, C.R. 172). Kumar failed to explain how [██████████████████████████ ████████████████████████████████████████████████████████ ], instead reiterating their answer from the 2021-2022 administrative review where Commerce previously applied total AFA to Kumar. *See* Kumar's May 28, 2024 Second Supplemental Response at 11-12 (P.R. 147 C.R. 129); *see also* IDM at 6-8; AFA Memo at 3 (P.R. 205, C.R. 172). Kumar failed to explain the proximate reason for Company A sharing a [███████████ ██████████ ] with Kumar's affiliates in 2020, when Kumar was allegedly not affiliated with Company A, instead merely noting that such a situation was legal. *See* Kumar's First Supplemental Questionnaire Response at 12-13 (P.R. 106 C.R. 73); *see also* Kumar's May 28, 2024 Second Supplemental Response at 17-18 (P.R. 147 C.R. 129); AFA Memo at 3 (P.R. 205, C.R. 172). Like in previous reviews, these plain facts demonstrate "that necessary information was missing from the record and that Kumar withheld requested information, failed to provide information by the deadlines, and significantly impeded the administrative review proceedings." *Kumar II*, 779 F. Supp. 3d at 1342; *Kumar I*, 665 F. Supp. 3d at 1362.

Unlike previous reviews, however, Commerce's analysis went beyond Companies A and B but also to Kumar's failure to explain why evidence on the record contradicted Kumar's claims of non-affiliation with Companies C and D.  For example, Kumar failed to explain the discrepancy between its claim that Company D had [ ███████████████████████████ ] and that Kumar's partners had submitted their resignation letter with [ ████████ ] with the evidence on the record that [ █████████████████████ █████████████████████████████████ ].  *See* Kumar's First Supplemental Questionnaire Response at 19-20 (P.R. 106 C.R. 73); *see also* Kumar's May 28, 2024 Second Supplemental Response at 18-19 (P.R. 147 C.R. 129); IDM at 9; AFA Memo at 5-6 (P.R. 147 C.R. 129). Rather than addressing this contradiction directly, Kumar instead continued to assert that Kumar's partners [ ████████ ] equity ownership rights in [ ██████████ ] before or during the POR and that [ ██████████████████████ ].  *See* Kumar's First Supplemental Questionnaire Response at 19-20 (P.R. 106 C.R. 73); *see also* Kumar's May 28, 2024 Second Supplemental Response at 19 (P.R. 147 C.R. 129).  Kumar also failed to provide Companies C and D's financial statements for the fiscal years April 1, 2021 through March 31, 2022, and April 1, 2022 through March 31, 2023.  *See* Kumar's First Supplemental Questionnaire Response at 20 (P.R. 106 C.R. 73); *see also* Kumar's May 28, 2024 Second Supplemental Response at 23 (P.R. 147 C.R. 129); IDM at 9; AFA Memo at 6 (P.R. 147 C.R. 129).

The credibility of many of Kumar's claims is undermined by the fact that evidence placed on the record concerning the Borad family is either "a) implausible; or b) evidence of a probable not-at-arm's length relationship between Kumar's owners and the Borad {f}amily."  *See* IDM at

11; *see also* AFA Memo at 4 (P.R. 147 C.R. 129).  Kumar claims "that as a result of a business

dispute between Kumar's owners and Borad family, the process of striking the names of

Companies C and D from the register of companies has not started yet."  *See* Initial

Questionnaire Response at 8 (P.R. 40, C.R. 8); *see also* IDM at 9.  This claim is undermined,

however, by Kumar's claim that the Borad family have twice passed ownership of Company A

and Company B between themselves and members of the [          ] without any

remuneration or other consideration, kept [

                                                                                  ], and granted [

                                                          ] to one of Kumar's affiliates.  *See*

Kumar's May 28, 2024 Second Supplemental Response at 6-7, 15-16, 20 (P.R. 147 C.R. 129);

*see also* IDM at 8-9, 11; AFA Memo at 4-5 (P.R. 147 C.R. 129).  Kumar has yet to even explain

the exact nature of this alleged business dispute, despite Commerce's repeated requests for more

information.  *See* Kumar's May 28, 2024 Second Supplemental Response at 21 (P.R. 147 C.R.

129).

     Based on these contradictions and Kumar's repeated refusal to provide any reliable

support of its claims of non-affiliation, Commerce reasonably determined that there was

necessary information missing from the record.  *See* 19 U.S.C. § 1677e(a).

     Kumar claims Commerce cannot cite a single document withheld by Kumar.  *See* Pl. Br.

at 15-16.  Further, Kumar asserts that even if this is not the case, that there is still no necessary

information missing from the record as all the discrepancies cited by Commerce pertain to

affiliation.  *See id.* at 18-20.  Kumar's theory is that because record evidence shows that neither

Company A nor B had any sales of glycine during the POR, Kumar's antidumping margin would

be the same whether or not the companies were viewed as affiliates.  *Id.* at 18.

What Kumar fails to understand, however, is that the countless contradictions in its reporting undermined the validity of Kumar's submissions overall, leading to Commerce's reasonable conclusion that it was unable to rely on any of Kumar's submissions for purposes of calculating an accurate dumping margin.  IDM at 10; *see Hyundai Electric & Energy Systems Co., Ltd. v. United States*, 617 F. Supp. 3d 1253, 1256 (Ct. Int'l Trade 2023) ("Commerce uses total adverse facts available to determine dumping margins when none of the reported data is reliable or usable.") (citation omitted).  This complete lack of reliable submissions created a gap in the record of necessary information within the meaning of 19 U.S.C. § 1677e(a)(1).  *See* IDM at 10; *see also Mukand Ltd. v. United States*, 767 F.3d 1300, 1308 (Fed. Cir. 2014) ("{U}se of partial {adverse} facts available is not appropriate when the missing information is core to the antidumping analysis and leaves little room for the substitution of partial facts without undue difficulty.").

Kumar's repeated failures to provide information responsive to Commerce's requests constitute a withholding of necessary information requested by Commerce within the meaning of 19 U.S.C. § 1677e(a)(2)(A) and a failure to provide necessary information by the deadlines for submission of the information within the meaning of 19 U.S.C. § 1677e(a)(2)(B), both of which significantly impeded the proceeding within the meaning of 19 U.S.C. 1677e(a)(2)(C).  *See* IDM at 9-10.  The contradictions on the record did not only speak narrowly to the facts being contradicted, but more broadly led Commerce to find "Kumar's databases to be unreliable for purposes of calculating an accurate dumping margin."  *See id.* at 9.

Kumar's further claim that "{t}he record does not contain any evidence that either Company C or Company D were involved in any capacity with selling or producing glycine" is a false appraisal of the record.  *See* Pl. Br. at 19.  In the [████████████████████████

**PUBLIC VERSION**

████████████████████████████████████████████████████████

██████████████████████████████████████████████████ ] *See*

GEO's October Comments at 10 and Exhibit 6 (P.R. 53 C.R. 20).  While Company C produces

[ ███████ ], Commerce was unable to ascertain which [ █████████████ ] produces

because Kumar did not answer which [ ████████ ] Company C produced in the past nor how

Kumar "can lack knowledge of the operations of an affiliate that Kumar shared directors/partners

with."  *See* Kumar's May 28, 2024 Second Supplemental Response at 21-22 (P.R. 147 C.R. 129).

Commerce reasonably declined to accept Kumar's submissions, which were nothing more than

"unsubstantiated claims of non-affiliation" directly contradicted by other record evidence.  *See*

*Kumar II*, 779 F. Supp. 3d at 1342.

Commerce's calculation of a zero percent margin in the preliminary results also does not

demonstrate that this missing information is immaterial to whether Kumar sold its merchandise

during the period of review at less than fair value.  Kumar cites to *Gerber Food (Yunnan) Co.,*

*Ltd. v. United States,* 387 F. Supp. 2d 1270 (Ct. Int'l Trade 2005) for the proposition that a minor

discrepancy in the record cannot be used to impugn the veracity of verifiable, company-specific

information that can be used to calculate final results.  *See* Pl. Br. at 15.  In *Gerber Food*, this

Court found misrepresentations relating to an export agency agreement were not sufficient to

impugn record evidence used to calculate assessment rates.  *See Gerber Food*, 387 F. Supp. 2d at

1281-1282.  Here, on the other hand, the discrepancies related to Kumar's affiliation with

Companies A and B directly impugn information relating to Companies A and B, *i.e.*, their sales

registers.  The "{m}isrepresentations and unreliable source documents regarding affiliation . . .

fundamentally undermine the credibility of the reported data themselves," bringing into question

whether or not Company A or B had sales of subject merchandise during the POR.  *See* IDM at

9, 11.  As this Court has recognized, "the method of calculating a margin would vary significantly depending on whether or not Kumar was affiliated."  *Kumar I*, 665 F. Supp. 3d at 1363.

Further, Commerce's preliminary calculation of a zero percent margin is not evidence that there exists verifiable, company-specific information on the record, as preliminary results "are 'preliminary' precisely because they are subject to change."  *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995).  Far from it being difficult to reconcile Commerce's preliminary zero rate assigned to Kumar with its application of AFA in the Final Results, the facts here are analogous to *Corinth Pipeworks Pipe Indus. SA v. United States,* 154 F.4th 1356, 1362 (Fed. Cir. 2025).  In *Corinth,* the Federal Circuit sustained Commerce's decision to apply total AFA at the final after calculating a zero percent rate in the preliminary results when Commerce determined that the respondent had deficiencies in their reconciliation data.  *See id.* at 1366-1367.  Significant to the Court in *Corinth,* as here, "Commerce noted that it received {the respondent's} response to the second supplemental questionnaire shortly before the Preliminary Results."  *Id.* at 1362.  Kumar significantly impeded the proceeding pursuant to 19 U.S.C. §1677e(a)(2)(C) by failing to provide information, in some cases, until the day of the *Preliminary Results.  See* Kumar's May 28, 2024 Second Supplemental Response at 9-10 (P.R. 147 C.R. 129); *see also* Kumar's June 4, 2024 Second Supplemental Response at 1-2 (P.R. 152 C.R. 135); Kumar's June 6, 2024 Second Supplemental Response at 1 (P.R. 157 C.R. 138); Kumar's Third Supplemental Response at 4 (P.R. 166 C.R. 148); PDM at 4; IDM at 9. Information related to Companies A and B, such as their audited financial statements, is information that Kumar should have been able to produce in a timely manner given that █

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ ].  *See* Second

Supplemental Questionnaire at 8 (P.R. 143, C.R. 128).

At the time of the preliminary determination, Commerce expressly noted that it was

waiting for answers from Kumar to the third supplemental questionnaire, and Commerce had

received Kumar's second supplemental response only a month before.  *See* PDM at 3.

Commerce acts well within its discretion to change course from a preliminary determination

when Commerce continues to receive contradictory information that did not address its concerns.

*See NTN Bearing Corp.*, 74 F.3d at 1208; *Corinth Pipeworks Pipe Indus.,* 154 F.4th at 1362.

### C.  Kumar Failed To Cooperate By Not Acting to the Best of its Ability

Having found that the criteria for using facts otherwise available were satisfied,

Commerce properly applied an adverse inference under 19 U.S.C. § 1677e(b) upon finding that

"Kumar failed to cooperate to the best of its ability because Kumar failed to provide information

regarding Kumar's affiliation with Companies A, B, C, and D, and/or any Borad family

affiliates, and failed to adequately explain contradictory information on the record."  *See* IDM at

11.

This determination was fully supported by record evidence, for similar reasons to those

discussed in the prior section.  Commerce observed that Kumar had failed to provide requested

information despite multiple requests, that Kumar failed to resolve contradictions in the record

despite multiple opportunities to do so, and that Kumar had sought to rely on information it had

submitted in past reviews despite the fact that Commerce had previously found that information

unreliable.  *See* IDM at 6-7.  Further, Kumar's inability to provide Company A and B's financial

statements in a timely manner constituted a failure to cooperate by not maintaining adequate

records when "Kumar knew that its affiliation status has been an issue since the investigation and

**PUBLIC VERSION**

in the three immediately preceding administrative reviews." *See* IDM at 11-12; *see also Kumar II*, 779 F. Supp. 3d at 1344 ("Commerce's requests for information regarding Kumar's affiliation with Companies A and B, therefore, should not have come as a surprise.").  In other words, Commerce reasonably concluded that Kumar could have—but did not—provide adequate information concerning its affiliation with Companies A and B, and that it had therefore failed to cooperate to the best of its ability.  Commerce reasonably found that an adverse inference was appropriate.

Kumar asserts that Commerce does not "claim that Kumar did not cooperate, but rather that certain discrepancies in the record . . . impugn the record such that a weighted-average antidumping margin cannot be calculated for Kumar," and that it was a "fully cooperative respondent by any reasonable measure."  Pl. Brief at 14.  However, this argument is contradicted by multiple instances on the record where Kumar does not answer a question directly asked by Commerce in a questionnaire.  And the very nature of the fact that Kumar did not resolve the record's contradictions and instead provided evidence which Commerce had already determined to be unreliable in the previous administrative reviews demonstrates their lack of cooperation.

When Kumar was specifically instructed that it had "failed to fully explain the specific proximate reason why" Company A's [███████████████] was the same as several of Kumar's other affiliates, Kumar simply answered that it had "duly explained" this in the First Supplemental Questionnaire Response.  *See* Kumar's May 28, 2024 Second Supplemental Response at 17-18 (P.R. 147 C.R. 129).  In the same vein, Kumar failed to answer how [██████████████████████████████████████████████████████████ ██████████████████████], instead repeating their answer from their first supplemental response which in turn reiterated information it had provided previously in the

2021-2022 administrative review, which Commerce found deficient at that time.  *See* Kumar's May 28, 2024 Second Supplemental Response at 11-12 (P.R. 147 C.R. 129); *see also* Kumar's Supplemental Response at 16-17; IDM at 6-8; and AFA Memo at 3 (P.R. 147 C.R. 129).  Kumar also did not answer which [███████] Company C produced in the past nor how Kumar "can lack knowledge of the operations of an affiliate that Kumar shared directors/partners with."  *See* Kumar's May 28, 2024 Second Supplemental Response at 21-22 (P.R. 147 C.R. 129).  Further, Kumar also did not answer Commerce's request to explain the exact nature of their financial dispute with the Borad family, nor did it provide any supporting documentation as requested. *See* Kumar's May 28, 2024 Second Supplemental Response at 21 (P.R. 147 C.R. 129).  Kumar's responses indicate a belief that it can dictate to Commerce when it has sufficiently provided an answer to Commerce's questions, but it is not up to the respondent to determine when the evidence they submit is sufficient.  *See Ferrostaal Metals GmbH v. United States*, 518 F. Supp. 3d 1357, 1376 (Ct. Int'l Trade 2021) ("[i]t is well established that it is Commerce, not the respondent, that determines what information is to be provided") (quotation omitted). Commerce plainly stated in its questionnaire that "{i}f Commerce does not receive either the requested information or a written extension request before the established deadline, we may conclude that your company has decided not to cooperate in this proceeding.  *See* Second Supplemental Questionnaire at 2 (P.R. 143, C.R. 128).  In all these examples Kumar provided neither the information requested by Commerce nor requested an extension to answer the question.

Finally, Kumar asserts that Commerce is wielding AFA as a punitive tool.  Pl. Br. at 12. Kumar is wrong.  "The purpose of the adverse {inference} statute is to provide respondents with an incentive to cooperate with Commerce's investigation, not to impose punitive damages."

*Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012) (cleaned up).  However, "{a} decision based on {an} adverse {inference} is not punitive when determined in accordance with the statutory requirements."  *Id.*  Kumar's argument fails for all the same reasons above.

This is yet another review where, for Companies C and D, "Kumar provided no supporting documentation containing substantive information beyond a statement of non-affiliation."  *Kumar II*, 779 F. Supp. 3d at 1344.  Accordingly, Commerce's conclusion that Kumar failed to cooperate to the best of its ability, and the resulting application of an adverse inference, is supported by the record and in accordance with law.

**D.  Commerce Notified Kumar of its Deficient Responses and Provided Kumar Opportunities To Remedy Them**

Kumar contends that Commerce failed to comply with its statutory obligation to inform a party of a deficiency and provide an opportunity to remedy the deficiency.  Pl. Br. at 14-15, 20-21 (citing 19 U.S.C. § 1677m(d)).  Kumar is wrong.  Commerce fully complied with § 1677m(d) by issuing multiple supplemental questionnaires to Kumar explaining how its responses were deficient and how Kumar could remedy them.

The statute provides that if Commerce "determines that a response to a request for information under this title does not comply with the request, {Commerce} … shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this title."  19 U.S.C. § 1677m(d).  Further, "{i}f that person submits further information in response to such deficiency and … {Commerce} … finds that such response is not satisfactory… then {Commerce} … may, subject to subsection (e) disregard all or part of the original and subsequent responses."  *Id.*

30

Kumar's claim that it "was not aware that there were certain pieces of the puzzle that did not fit together perfectly" is inaccurate. Pl. Br. at 20. This assertion ignores that Kumar received four questionnaires from Commerce that expressly explained Commerce's concerns with conflicting information on the record.

After Kumar claimed that it had become affiliated with Companies A and B as of April 1, 2023, Commerce issued a supplemental questionnaire specifically requesting further information on its affiliation with Companies A, B, C, and D. First Supplemental Questionnaire at 6-10 (P.R. 82, C.R. 47). Upon reviewing Kumar's response to the supplemental questionnaire and finding it deficient, Commerce issued another supplemental questionnaire notifying Kumar of the deficiency, explaining why its prior response was deficient, and explaining what information it must provide to substantively respond to Commerce's request. *See* Second Supplemental Questionnaire at 6, 8-9, 11 (P.R. 143, C.R. 128). Commerce even reminded Kumar in its first and second supplemental questionnaires that it had applied AFA to Kumar in a previous administrative review based on the contradictory information Kumar was continuing to rely upon in this administrative review. *See* First Supplemental Questionnaire at 6, 8 (P.R. 82, C.R. 47); *see also* Second Supplemental Questionnaire at 5 (P.R. 143, C.R. 128). Thus, Commerce identified the deficiency and provided Kumar an opportunity to remedy that deficiency, in accordance with section 1677m(d). *See Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1361 (Fed. Cir. 2017); *Kumar II*, 779 F. Supp. 3d at 1347 ("Commerce does not have an obligation to provide never-ending questionnaires"); *Shandong Dongfang Bayley Wood Co. v. United States,* 375 F. Sup. 3d 1339, 1342 (Ct. Int'l Trade 2019) ("Commerce satisfies its obligations under § 1677m(d) when it issues a supplemental questionnaire specifically pointing out and requesting clarification of the party's deficient responses"). Rather than remedying the

deficiency by providing supporting documentation or explaining the inconsistencies, Kumar reiterated its assertions and claimed it could not provide underlying documentation.

Kumar's reliance on *Meihua Group International Trading (Hong Kong), Ltd. v. United States*, 686 F. Supp. 3d 1359, 1370 (Ct. Int'l Trade 2024) (*Meihua*) is inapposite. *See* Pl. Br. 20-21. Unlike *Meihua,* where Commerce "did not 'promptly inform the person submitting the response of the nature of the deficiency and… to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency,'" Commerce here specifically identified contradictions in the record which it then requested Kumar remedy or explain.

Kumar appears to be arguing that Commerce had a never-ending obligation to provide additional supplemental questionnaires until it was satisfied with Kumar's answers, as long as there was enough time left in the review to do so. This ignores the plain language of the statute, discussed above, which allows Commerce to disregard a party's responses once Commerce has notified the party of a deficiency and received a response that is still not satisfactory. 19 U.S.C. § 1677m(d). Once Kumar failed to resolve the discrepancies identified in the record after having been given at least two opportunities to do so, Commerce was not required to issue an additional "supplemental questionnaire to the effect of, 'Are you sure?'" *See Saha Thai Steel Pipe Pub. Co. Ltd. v. United States*, 663 F. Supp. 3d 1356, 1374 (Ct. Int'l Trade 2023) (citing *ABB Inc. v. United States*, 355 F. Supp. 3d 1206, 1222 (Ct. Int'l Trade 2018); *see also New Mexico Garlic Growers Coalition v. United States*, 352 F. Supp. 3d 1281, 1295 (Ct. Int'l Trade 2018) (holding that Commerce is not required to issue multiple supplemental questionnaires to respondents, instead one supplemental questionnaire is enough to satisfy Commerce's obligations) (citing *Maverick Tube*, 857 F.3d at 1361). Because Kumar refused to provide any significant additional

information, there was no point in issuing further questionnaires asking for the same information yet again.

### III.    Commerce Properly Calculated the Non-Selected Company Rate Applied To Bajaj

Commerce's determination to assign the simple average of Kumar and Avid's dumping margins to Bajaj pursuant to 19 U.S.C. § 1673(c)(5)(B) is supported by substantial evidence and in accordance with law.  *See Final Results*, 90 Fed. Reg. at 15,690.  While the statute does not specifically provide for the calculation of the rate assigned to non-individually examined respondents in administrative reviews (termed an "all-others rate"), Commerce looks to 19 U.S.C. § 1673d(c)(5), which provides the method for determining the estimated all-others rate in an investigation.  *See Albemarle Corp. & Subsidiaries v. United States.,* 821 F.3d 1345, 1351-53 (Fed. Cir. 2016) (applying 19 U.S.C. § 1673d(c)(5) in the administrative review context).

Although Commerce can assign individual rates for each known exporter of the foreign merchandise, it often limits its examination to a "reasonable number" of exporters, called mandatory respondents.  19 U.S.C. § 1677f-1(c)(1)-(2).  Mandatory respondents are typically the largest volume exporters, because they are presumed representative of all exporters and producers.  *See Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1372 (Fed. Cir. 2013); *see also National Knitwear & Sportswear Ass'n v. United States*, 779 F. Supp. 1364, 1374 (Ct. Int'l Trade 1991) ("Where the Department does use sampling or averaging, 'such samples and averages shall be *representative* of the transactions under investigation.'") (quoting 19 U.S.C. § 1677f-1(b)).  For non-mandatory respondents, Commerce calculates the all-others rate.  *See* 19 U.S.C. § 1673d(c)(1)(B)(i).

Pursuant to subsection 1673d(c)(5)(A), Commerce calculates the all-others rate by taking a weighted average of the dumping margins for the individually examined respondents,

excluding any margins that are zero, *de minimis*, or determined entirely based on the facts available. However, where dumping margins for all individually examined companies are zero, *de minimis* or determined based entirely on facts available, Commerce "may use any reasonable method to establish the estimated all-others rate . . . , including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated." 19 U.S.C. § 1673(c)(5)(B). The Statement of Administrative Action provides that in such situations the expected method is to weight-average the zero and *de minimis* margins and the margins determined pursuant to the facts available, provided volume data is available, unless doing so is not feasible or would not be reasonably reflective of potential dumping margins. *See Statement of Administrative Action accompanying the Uruguay Round Agreements* Act, H.R. Rep. No. 103-316, Vol. 1 (1994) (SAA), at 873.

"{T}he expected method is the default method." *PrimeSource Bldg. Prods. v. United States*, 111 F.4th 1320, 1330 (Fed. Cir. 2024) (quoting *PrimeSource Bldg. Prods. v. United States*, 581 F. Supp. 3d 1331, 1338 (Ct. Int'l Trade 2022)). Therefore, "the burden of proof" for seeking a deviation from the expected method "lies with the party seeking to depart from the expected method." *Id.* (quoting *PrimeSource Bldg. Prods.*, 581 F. Supp. 3d at 1338). When the deviating party meets their burden of proof, the Federal Circuit has stated that there is "no legal error" in using a simple average of a *de minimis* or zero rate and a total AFA rate assigned to two mandatory respondents to calculate the separate rate. *Bestpak*, 716 F.3d. at 1378. [4]

---

[4] Interestingly, even in *PrimeSource*, Commerce referred to the all-other rate at issue as a "simple average" in the final results in both the Federal Register notice and decision memorandum. *See Certain Steel Nails From Taiwan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018– 2019*, 85 Fed. Reg. 76,014, 76,015 (November 27, 2020) ("in accordance with the U.S. Court of Appeals for the Federal Circuit's decision in *Albemarle*, we are applying a rate based on the simple average of the individual rates applied to {the mandatory respondents}) and accompanying IDM at 10

Commerce's calculated all-other rate, a simple average of Avid's zero percent and Kumar's AFA rate, is a reasonable determination supported by substantial evidence. *See* 19 U.S.C. § 1673d(c)(5)(B) (allowing Commerce to use "any reasonable method"). The Federal Circuit has affirmed this simple average methodology using both zero and AFA rates. *See Bosun Tools Co. v. United States*, 2022 WL 94172, at *4 (Fed. Cir. Jan. 10, 2022). Here, Commerce found Kumar's submissions and databases "to be unreliable," IDM at 9, and "undermined the validity of the company's submissions overall, such that we are unable to reply on those submissions." IDM at 10. As such, Commerce did not have reliable sales information to use when calculating a weighted average. Because volume data was unavailable, or incomplete at best, it is reasonably discernable that Commerce did the next best thing: a simple average of the determined rates. *See CME Acquisitions, LLC v. United States*, 793 F. Supp. 3d 1375, 1389-90 (Ct. Int'l Trade 2025) (sustaining Commerce's simple average of two AFA rates).

In any event, Bajaj's arguments fail. Bajaj has waived any argument that Commerce did not meet its burden under *PrimeSource*, and failed to demonstrate that pulling forward a past rate would be reasonable.

## A.    Bajaj Waived Any Argument that Commerce Did Not Meet its Burden To Deviate from the Expected Method

To the extent Bajaj argues Commerce violated *PrimeSource*, that argument is waived because it was not properly raised in its opening brief. *See Cooper Kushan Tire Co. v. United States*, 539 F. Supp. 3d 1316, 1337-38 (Ct. Int'l Trade 2021). Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, a party moving for judgment on the agency

---

("Consistent with *Albemarle* and our practice, Commerce applied the expected method under section 735(c)(5)(B) of the Act, to determine review-specific, simple-average margin for those companies that were requested, and initiated, for review, but were not selected for individual examination.").

record must state, "the issues of law presented together with the reasons for contesting . . . the administrative decision."  USCIT R. 56.2(c)(1).  If a party fails to raise issues of law and accompanying arguments, they forfeit the ability to assert those claims.  *De Laval Separator Co. v. United States*, 511 F. Supp. 810, 812 (Ct. Int'l Trade 1981).  A party waives a claim when they make only "bare assertions . . . unaccompanied by some effort at developed argumentation." *MTZ Polyfilms, Ltd. v. United States*, 659 F. Supp. 2d 1303, 1308 (Ct. Int'l Trade 2009); *Fujian Lianfu Forestry Co., Ltd. v. United States*, 638 F. Supp. 2d 1325, 1350 (Ct. Int'l Trade 2009).

Bajaj has waived any argument based on *PrimeSource* that Commerce failed to meet its burden to proof because it has only made bare allegations and did not cite relevant legal authority.  Bajaj did not cite *PrimeSource* in its motion, nor did it argue that Commerce deviated from the expected method.  *See* Pl. Br. at 21-23.  Instead, Bajaj's argument is better characterized as a philosophical view on how Commerce should have calculated the dumping margin.  *See id.* (arguing that "Commerce's inclusion of the AFA rate . . . unfairly distorted the separate rate," "Bajaj Healthcare is being unfairly punished," and for "a fairer estimation of the separate rate").  By failing to do anything more than hint at *PrimeSource*, Bajaj forfeits any argument that Commerce did not meet its burden of proof.

**B.    There Is No Evidence that Pulling Forward the Previous All-Others Rate Would Be Reasonable**

Bajaj claims that it is being unfairly punished with an aberrational rate distorted by Kumar's AFA rate, and that this Court should remand for Commerce to recalculate the all-others rate.  Pl. Br. at 21-23.  Bajaj asserts that a fairer estimation of its rate would be to assign the non-individually examined respondent's rate from the previous administrative review of this antidumping order.  *Id.* at 23.

36

Bajaj's suggested rate would defy the statutory directive, however, which explicitly contemplates use of AFA and zero or *de minimis* rates in calculating a non-individually examined respondent's rate, and also prioritizes contemporaneity. *See Albemarle Corp.*, 821 F.3d at 1356 ("{t}here is no basis to simply assume that the underlying facts or calculated dumping margins remain the same from period to period"). Pulling forward a previous rate is a departure from the expected method. *See PrimeSource*, 111 F.4th at 1380; *CME Acquisitions*, 793 F. Supp. 3d at 1387-88 ("Because pulling forward rates from past reviews is a departure from the expected method, the party asking for such a method must justify its use with substantial evidence on the record."). As such, Bajaj does not demonstrate that the expected method was not feasible or resulted in a rate not reasonably reflective of its actual dumping margins. *See PrimeSource*, 111 F.4th at 1380.

Further, Bajaj did not present evidence that Commerce's review of Kumar and Avid was not representative of its dumping behavior. The antidumping statute has a "preference for contemporaneity in periodic administrative reviews." *Albemarle*, 821 F.3d at 1356. Reviews should be as "current as possible," and parties should not assume the underlying data remains the same each year. *Alegheny Ludlum Corp. v. United States*, 346 F.3d 1368, 1373 (Fed. Cir. 2003). Accordingly, there is no value in using a stale rate from a prior review. And the rates determined for the mandatory respondents in this review are presumed to be representative of the non-selected respondents. *See PrimeSource*, 111 F.4th at 1331 (citing *Changzhou Hawd Flooring v. United States*, 848 F.3d 1006, 1012 (Fed. Cir. 2017)). Even a rate determined based on AFA is probative of dumping margins because it "reflects a common sense inference that the highest prior margin is the most probative evidence of current margins because, if it were not so, the importer, knowing of the rule, would have produced current information showing the margin to

37

PUBLIC VERSION

be less." *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1190 (Fed. Cir. 1990). Kumar's

failure to cooperate is evidence that its dumping margin is equal to or higher than the AFA rate,

especially when Kumar has consistently received this AFA rate in previous reviews. *See*

*PrimeSource*, 111 F.4th at 1332. Accordingly, Bajaj fails to establish a reasonable alternative.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court deny Plaintiffs' motion, sustain

Commerce's final results, and enter judgement for the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA McCARTHY
Director

CLAUDIA BURKE
Deputy Director

<u>/s/ Collin T. Mathias</u>
COLLIN T. MATHIAS
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
PO Box 480
Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-0315
Email: Collin.T.Mathias@usdoj.gov

OF COUNSEL:
Samuil Agranovich
Attorney
U.S. Department of Commerce
Office of the Chief Counsel for Trade
Enforcement and Compliance

Attorneys for Defendant

January 30, 2026

PUBLIC VERSION

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 11,422 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

<u>/s/ Collin T. Mathias</u>
COLLIN T. MATHIAS